735 A.2d 491

Peter Michael FERRIS

v.

STATE of Maryland.

No. 127, Sept. Term, 1997.

Court of Appeals of Maryland.

Aug. 18, 1999.

358

Patrick E. Maher, Towson (Jay C. Beasley, Michael J. Nehring, Hagerstown, all on brief), for Petitioner.

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW *, RAKER, WILNER and CATHELL, JJ.

RAKER, Judge.

Petitioner Peter Michael Ferris appeals the denial of his motion to suppress evidence seized by the police. Because the police officer in this case effected a seizure not premised upon the reasonable, articulable suspicion required under the Fourth Amendment, we shall hold that the Circuit Court for

---

* Chasanow, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of this opinion.

Washington County erred in denying Ferris's motion to suppress.

## I.

In the early morning hours of May 7, 1996, Maryland State Trooper Andrew Smith was operating a laser speed gun on Interstate 70, just east of Route 66 in Washington County, Maryland. The posted speed limit was 65 miles per hour. At 1:06 a.m., Trooper Smith observed a westbound Toyota Camry traveling down a mountain at what appeared to be a high rate of speed. Engaging the laser device, the trooper clocked the vehicle's speed at 92 miles per hour.

Trooper Smith activated his emergency lights and stopped the car without incident. The trooper parked his patrol car approximately twenty feet behind Petitioner's car. Trooper Smith approached the Camry and observed Ferris, the driver, and one passenger, Michael Discher, in the front seat. Smith asked Ferris to produce his driver's license and registration. At the hearing on Ferris's motion to suppress tangible evidence seized by the trooper, Trooper Smith testified that during this initial encounter he noticed that Ferris's "eyes were bloodshot and he did appear a little nervous, a little fidgety."

Trooper Smith returned to his patrol car and requested a driver's license and outstanding warrant check on Ferris. The trooper began to write the speeding citation. During this time, Trooper Smith glanced up several times and noticed that Ferris and Discher were moving around and looking back towards him "quite frequently." Specifically, Smith testified that Ferris and the passenger looked back at the patrol car three or four times.

While Trooper Smith was writing the citation, Deputy John C. Martin of the Washington County Sheriff's Department arrived and parked ten feet behind Smith's patrol car, activating his vehicle emergency "flashers."[1] Deputy Martin ap-

---

1. During cross-examination at the suppression hearing, Deputy Martin distinguished between "full emergency lights" and "[w]hat we call our

proached Trooper Smith's patrol car and spoke briefly with the trooper. After witnessing Ferris and Discher "moving around in the vehicle a lot and looking around," the deputy relayed that observation to Trooper Smith.

Trooper Smith returned to the Camry with Deputy Martin, who went to the rear of the passenger's side of the vehicle. Ferris signed the citation, and then the trooper returned Ferris's driver's license and registration along with a copy of the citation. Although Trooper Smith did not advise Ferris that he was free to depart or that he was not free to leave, the trooper testified: "I just asked him if he would mind stepping to the back of his vehicle to answer a couple of questions. He stated he didn't mind." Ferris accompanied the trooper to the rear of the Camry. During this time, Deputy Martin remained between the Camry and Trooper Smith's patrol car and watched Discher, the passenger. At the suppression hearing, Trooper Smith testified that the reasons he asked Petitioner to step out of the car were that Petitioner's eyes were bloodshot, Petitioner and the passenger were acting very nervous, and there was no detectable odor of alcohol on Petitioner's breath.[2]

Behind the Camry, Trooper Smith first asked Ferris if he had smoked any drugs prior to the traffic stop. Trooper Smith testified that Ferris became more nervous in response to this question. Ferris answered by stating that he had not smoked anything. Trooper Smith again asked Ferris "was he sure that he hadn't smoked any drugs because of the fact that

---

flashers." Only the latter were activated in this instance. Deputy Martin defined the "flashers" as comprising two blinking lights in the grill of the patrol car and two blinking lights on the top of the vehicle.

2. When asked at the suppression hearing why he asked Ferris to step out of his car, Trooper Smith responded on direct examination that he suspected that "there may have been some drug use on the part of the driver." On cross examination, the trooper testified, "The reason I wanted [Ferris] to exit his vehicle was so he could answer some questions.... I wanted to find out whether ... there was a discrepancy between what he was telling me [and] what his passenger was telling me."

his eyes were bloodshot, extremely bloodshot and he didn't have alcohol on his breath." During the encounter, the trooper remained within two or three feet of Ferris.

At this juncture, Ferris admitted that he and his passenger had smoked a "joint" in Philadelphia about three hours earlier. Ferris stated that he and the passenger were traveling from Philadelphia to Morgantown, West Virginia. Trooper Smith then asked Ferris whether the passenger was in possession of any controlled dangerous substances. Ferris acknowledged that Discher possessed a small amount of marijuana. Thereupon Trooper Smith approached Discher, still seated in the front passenger seat of Ferris's car. After Trooper Smith questioned Discher, the latter turned over a small baggie containing marijuana. Trooper Smith then searched the Camry. On the rear seat, the trooper found a green L.L. Bean book bag. Trooper Smith uncovered a gallon-sized plastic baggie inside the book bag containing a compressed, green vegetable matter, a substance the trooper believed to be marijuana.

As a result of this incident, the State's Attorney for Washington County charged Ferris by criminal information with: operating a motor vehicle in excess of the posted speed limit, in violation of Maryland Code (1977, 1999 Repl.Vol.) § 21–801.1 of the Transportation Article; possession of marijuana, in violation of Maryland Code (1957, 1996 Repl.Vol., 1998 Supp.), Article 27, § 287; and possession of marijuana in sufficient quantity to reasonably indicate an intent to distribute that substance, in violation of Article 27, § 286(a)(1). Prior to trial, Ferris moved to suppress all evidence and statements illegally obtained.

At the suppression hearing, the State and Ferris presented essentially the same primary arguments made before this Court. The circuit court rejected the analytical path taken by the parties, instead reasoning:

Well I don't want anybody to lose the forest for the trees. The citizen has a right not to be unreasonably seized nor to

have property unreasonably searched and seized under the totality of the circumstances.

You know I've heard the State talk about *Terry* and articulable suspicions and the defense talking about the end of one stop and seizure and the beginning of another stop and seizure. Quite frankly I think that neither argument is persuasive. What we have to do is look at the situation, the entire totality of the situation that the officer found himself in on this occasion to determine if he acted unreasonably in any stop, in any seizure, in any search and seizure.

Now the officer has a vehicle that's going ninety-two miles an hour on a highway that even though I don't think there was evidence of this fact but I think we can take judicial notice of the fact that the speed limit was sixty-five or under at the time. So we have a situation where he has a driver of a motor vehicle that's going well over the speed limit.

He stops that motor vehicle. He notes that the driver of the motor vehicle has extremely bloodshot eyes, not just bloodshot eyes, extremely bloodshot eyes and is exhibiting signs or symptoms of nervousness, fidgety.

It's an out of state vehicle. He checks the registration, ownership, license, determines that the license and registration are appropriate. But then [the officer] goes back to the vehicle. And what's he going to do? What's expected of him? Is he to allow a person who is operating at ninety-two miles an hour with bloodshot eyes to sign a citation and get back into the vehicle and drive it away?

Or is he expected to proceed to further investigate the condition of the driver? And that's what he was doing when he then asked the driver to step back and answer certain questions. It was, I think, a very reasonable expected continuation of the encounter between the officer and the driver of this motor vehicle.

The driver is operating in a dangerous way. And he's got bloodshot eyes. And I think it would be expected that this officer would inquire further and not just allow the driver

with bloodshot eyes who's been going ninety-two miles an hour to get back in that vehicle and drive it away.

And that is what the officer did. He continued ... there was no, I do not feel that there was any end of one stop and the beginning of another stop and seizure. It was a continuation. It's expected of this officer to have done what he did.

So then the driver of the motor vehicle does in fact answer the questions without intimidation, voluntarily answers the questions. And as the questions are asked and answered, there is an incriminating response which leads to the recovery of a controlled dangerous substance from an ... individual who then gives the officer further probable cause to believe that the vehicle itself contained contraband or does surely under any of our known doctrines enable it to be searched, and the contents of that vehicle.

So under the totality of the circumstances I see nothing ... that the officer did wrong, no violation of any right against unreasonable stop, seizures, searches of this defendant.

The trial court therefore denied Ferris's motion to suppress.

Ferris was tried before a jury in the circuit court and convicted of speeding and possession of marijuana with the intent to distribute. On the marijuana charge, the court sentenced Ferris to a term of incarceration of eighteen months, with all but five months suspended. Ferris noted a timely appeal to the Court of Special Appeals.

Before the Court of Special Appeals, Ferris challenged only the denial of his motion to suppress. A divided panel of the intermediate appellate court affirmed in an unreported opinion. As to the question of whether Ferris had been seized under the Fourth Amendment during the encounter with Trooper Smith, the court reasoned that the finding of the motions judge that the conversation between Ferris and the officer was consensual was not clearly erroneous.[3] Alterna-

---

3. Ferris argues that the motions judge made no such finding that the encounter was consensual but found only that there was a single

tively, the Court of Special Appeals held that Trooper Smith's detention of Ferris was lawful because the trooper "had an articulable suspicion of suggested criminal activity based upon his observation of extremely bloodshot eyes, unusual nervousness and fidgeting inside the car, and the knowledge that the absence of an odor of alcohol may indicate drug use as well as sobriety."

Judge Thieme dissented, writing that he would hold that Ferris was seized when the trooper requested that he exit his vehicle and proceed to the back of that vehicle. He noted that under certain circumstances, the request of an officer to exit the vehicle, as opposed to an order to leave the vehicle, may be indistinguishable from a command. Judge Thieme reasoned:

> The appellant had already been lawfully detained pursuant to a traffic infraction and, after a license check had been completed and a speeding violation had been issued, Officer Smith requested that the appellant exit and step to the rear of the vehicle. A reasonable person, on the return of his license and registration and the acceptance of a citation, would (most assuredly with relief) have viewed the traffic stop as over. And, at that point, a reasonable person would have felt free to leave. For the officer then to request the driver to exit the vehicle, separating the driver not only from the vehicle but also from any occupants who may have been in that vehicle (as was the passenger in this case), with no apparent justification for doing so, would clearly arouse a feeling that that person was not free to leave. Furthermore, the presence of two officers (one a county and one a State police officer) would have only added to the already mounting apprehension on the part of the driver.

---

continuous seizure, and that Ferris answered the trooper's questions voluntarily. We agree with Ferris. Moreover, we interpret the motion judge's ruling that "the driver of the motor vehicle does in fact answer the questions without intimidation, voluntarily answers the questions" to refer to the questioning at the rear of the Camry, and not to the earlier point in time when Ferris exited the Camry.

The dissent also found lacking any reasonable, articulable suspicion sufficient to justify any further detention of Ferris.

This Court granted Ferris's petition for writ of certiorari to consider two questions: (1) whether an operator of a motor vehicle is seized within the meaning of the Fourth Amendment when he is asked to get out of his car for questioning after a traffic stop is completed, and (2) whether the Court of Special Appeals erred in finding that the seizure of Petitioner was justified by reasonable, articulable suspicion.

## II.

### A.

Ferris argues that his encounter with Trooper Smith following the issuance of the citation and the return of his license and registration card constituted an illegal seizure under the Fourth Amendment. He reasons that once the trooper had returned his documents and had issued the citation, the purpose of the original stop for speeding had been satisfied; thus, for Fourth Amendment purposes, any continued detention was a "second stop" requiring independent reasonable, articulable suspicion. Ferris also contends that the Court of Special Appeals erred in finding that the officer had reasonable suspicion of criminal activity under the circumstances of this case. By contrast, the State argues that the police questioning in this case was a consensual encounter that did not implicate the Fourth Amendment. Alternatively, the State contends that, even assuming there was a Fourth Amendment seizure, that intrusion was justified.

Our review of the circuit court's denial of the motion to suppress under the Fourth Amendment is based solely upon the record of the suppression hearing. *In re Tariq A-R-Y*, 347 Md. 484, 488, 701 A.2d 691, 693 (1997). We review the trial court's factual findings in the light most favorable to the State, and review these findings for clear error, but we view the legal conclusions *de novo*. *Id.* at 488–89, 701 A.2d at

693; *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990).

■■■ The Fourth Amendment protects against unreasonable searches and seizures, including seizures that involve only a brief detention. *United States v. Mendenhall,* 446 U.S. 544, 551, 100 S.Ct. 1870, 1875, 64 L.Ed.2d 497 (1980). The Supreme Court has made clear that a traffic stop involving a motorist is a detention which implicates the Fourth Amendment. *See United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985); *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (analogizing the degree of intrusiveness of the usual traffic stop to the degree of restraint imposed by the typical *Terry* stop). It is equally clear, however, that ordinarily such a stop does not initially violate the federal Constitution if the police have probable cause to believe that the driver has committed a traffic violation. *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). Nonetheless, the Supreme Court has also made it clear that the detention of a person "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion).

It is without dispute that the stop of Ferris by Trooper Smith for exceeding the posted speed limit constituted a seizure for Fourth Amendment purposes, but that such a seizure was justified by the probable cause possessed by the trooper in having witnessed Ferris's traffic violation. Indeed, Ferris does not contest the initial stop. The real issue lies in the actions taken by the officer *after* he had issued the speeding citation to Petitioner and had returned his driver's license and registration to him.

Contrary to the trial court's finding that there was a single, continuous stop and no "end of one stop and the beginning of another stop and seizure," Ferris argues that the initially valid stop evolved into an unreasonable detention. He argues that once the purpose of a traffic stop has been satisfied, any

further detention or questioning of the driver constitutes an unreasonable and therefore unlawful detention, unless such detention is supported by reasonable, articulable suspicion, probable cause, or consent. We have not had occasion to consider the question of the extent to which a law enforcement officer who has properly stopped a motor vehicle based on probable cause may detain and question the driver after the officer has concluded the purpose for the initial stop. The Court of Special Appeals, however, has addressed this issue on several occasions.

In *Snow v. State*, 84 Md.App. 243, 578 A.2d 816 (1990), the Court of Special Appeals considered the question of whether a police officer had a reasonable and articulable suspicion to justify detaining a driver after the officer had issued a written warning for a speeding violation. *Id.* at 246, 578 A.2d at 817. In *Snow*, as in the case at bar, the police had probable cause to stop the vehicle. The court noted that once the purpose of the initial stop had been fulfilled, *i.e.* when the officer had issued the warning, the proper focus was on the subsequent detention of Snow and his passenger in order to scan the vehicle for the presence of drugs. *Id.* at 248, 578 A.2d at 818. Judge Rosalyn Bell, writing for the court, reasoned that if Snow was "seized" for Fourth Amendment purposes, that seizure must be supported by at least "a reasonable, articulable suspicion that a crime is being or is about to be committed." *Id.* at 265, 578 A.2d at 826. Quoting this Court's decision in *State v. Lemmon*, 318 Md. 365, 372, 568 A.2d 48, 52 (1990), the court observed that

> [t]he Court of Appeals ... stated that *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988), "declares that the test to be applied in determining whether a person has been 'seized' within the meaning of the Fourth Amendment is whether in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."

*Snow*, 84 Md.App. at 249, 578 A.2d at 819. The intermediate court held that the purpose underlying the initial stop had been realized when the officer issued the warning, and there

was no reasonable, articulable suspicion to support "the second act of detaining Snow for the scan of his vehicle." *Id.* at 267, 578 A.2d at 827. Therefore, the court reversed, holding that the evidence recovered should have been suppressed. *Id.* at 246, 578 A.2d at 817.

In *Munafo v. State*, 105 Md.App. 662, 670, 660 A.2d 1068, 1072 (1995), the driver of a motor vehicle was stopped by the police based on probable cause that the driver had violated several motor vehicle laws. As in the case at bar, Munafo conceded that the initial traffic stop was legal, but he maintained that there were two stops that night—the initial stop supported by probable cause and the second stop which occurred immediately thereafter. *Id.* at 669, 660 A.2d at 1071. He argued that the officer should have issued a ticket or a warning promptly after receiving the results of the radio license and registration check, and that his continued detention was illegal because it was not supported by a reasonable suspicion. *Id.* at 669–70, 660 A.2d at 1071. Relying on *Snow*, the intermediate appellate court reasoned that

> the purpose of a traffic stop is to issue a citation or warning. Once that purpose has been satisfied, the continued detention of a vehicle and its occupant(s) constitutes a second stop, and must be independently justified by reasonable suspicion.

*Id.* at 670, 660 A.2d at 1072. The court concluded that the brief delay after the officer learned that the license and registration were in order was entirely unjustified by the purpose of the original stop and hence constituted a separate stop which must be supported by at least reasonable, articulable suspicion. *Id.* at 673, 660 A.2d at 1073. Finding that the officer harbored no more than an "hunch" that Munafo was in possession of drugs, the intermediate court held that the trial court erred in denying the motion to suppress. *Id.* at 676, 660 A.2d at 1075. *See also Pryor v. State*, 122 Md.App. 671, 682, 716 A.2d 338, 344 (1998) (holding "detention that extended beyond the period of time that it would reasonably have taken for a uniformed officer to go through the procedure involved

in issuing a citation to a motorist" was unjustified and therefore unconstitutional).

In sum, the officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning. Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention. *See Royer,* 460 U.S. at 500, 103 S.Ct. at 1325–26. Thus, once the underlying basis for the initial traffic stop has concluded, a police-driver encounter which implicates the Fourth Amendment is constitutionally permissible only if either (1) the driver consents to the continuing intrusion or (2) the officer has, at a minimum, a reasonable, articulable suspicion that criminal activity is afoot. *United States v. Sandoval,* 29 F.3d 537, 540 (10 th Cir.1994).

Many other courts around the country, in addressing traffic stops under similar circumstances, have held that continued detention, absent independent justification, constitutes an illegal seizure under the Fourth Amendment. For example, the Supreme Court of Colorado observed:

> When, as here, the purpose for which the investigatory stop was instituted has been accomplished and no other reasonable suspicion exists to support further investigation, there is no justification for continued detention and interrogation of citizens.

*People v. Redinger,* 906 P.2d 81, 85–86 (1995) (*en banc*) (footnote omitted). *See United States v. Soto–Cervantes,* 138 F.3d 1319, 1322 (10 th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 131, 142 L.Ed.2d 106 (1998); *Karnes v. Skrutski,* 62 F.3d 485, 491 (3 rd Cir.1995); *United States v. Ramos,* 42 F.3d 1160, 1163 (8 th Cir.1994); *United States v. Obasa,* 15 F.3d 603, 607 (6 th Cir.1994); *People v. Rodriguez,* 945 P.2d 1351, 1360 (Colo.1997) (*en banc*); *Commonwealth v. Torres,* 424 Mass. 153, 674 N.E.2d 638, 642 (1997). *See also Berkemer,* 468 U.S. at 439–40, 104 S.Ct. at 3150 ("[U]nless the detainee's answers provide the officer with probable cause to arrest him, he must then be released") (footnotes omitted); *Davis v. State,* 947

S.W.2d 240, 243 (Tex.Crim.App.1997) (*en banc*) ("[O]nce the reason for the stop has been satisfied, the stop may not be used as a 'fishing expedition for unrelated criminal activity.'" (quoting *Ohio v. Robinette,* 519 U.S. 33, 40, 117 S.Ct. 417, 422, 136 L.Ed.2d 347 (1996) (*Robinette II* ) (Ginsburg, J., concurring))). Many of these cases employing careful scrutiny if not skepticism over continued detentions in the context of traffic stops are consistent with the admonition of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny that a *Terry* stop must not only be justified at its inception, but its scope throughout must be reasonably related to the circumstances which justify the intrusion. *United States v. Babwah,* 972 F.2d 30, 33 (2 nd Cir.1992).

▮▮ We conclude, after considering all the circumstances of the initial encounter between Trooper Smith and Petitioner, that the traffic stop essentially came to an end upon the trooper's delivery of the citation, and return of the driver's license and registration. Once Ferris signed and returned the citation in compliance with Maryland traffic laws, Maryland Code (1977, 1999 Repl.Vol.), § 26–203 of the Transportation Article, he had completed all his duties pertaining to the traffic stop itself. Because the traffic stop had ended there, Ferris was lawfully free to drive away, as Trooper Smith himself acknowledged in his own testimony.

### B.

The more difficult question we must answer in this case is whether Trooper Smith's questioning of Petitioner after he had issued the traffic citation and had returned the driver's license and registration documents constituted a detention, or seizure, and hence raises any Fourth Amendment concerns, or was merely a "consensual encounter," [4] thus implicating no

---

4. A consensual encounter has been defined as

 simply the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement official. Because an individual is free to leave at any time during such an encounter, he is not "seized" within the meaning of the fourth amendment.

constitutional overview.[5]

██ As we have indicated, the initial stop of Petitioner was a legal stop for speeding. The State postulates that "Ferris was merely *asked* to step from the vehicle" and asserts that "the fact that Ferris was asked to exit the vehicle for questioning [does not] transform the encounter into a seizure." The State likewise describes the scenario immediately after Petitioner exited his car as one in which Trooper Smith "was merely asking Ferris questions, which questions Ferris voluntarily answered." It is in this way that the State attempts to characterize the encounter as completely "consensual" and thus not subject to Fourth Amendment scrutiny. Petitioner contends that the trooper's request that he move to the rear of the Camry and subsequent actions after the completion of the traffic stop constituted a seizure and was not a consensual encounter. We agree with Petitioner.

██ Mere police questioning does not constitute a seizure. *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991) (noting that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions"); *see also Royer,* 460 U.S. at 498, 103 S.Ct. at 1324 (stating that "[i]f there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed"). This is so even if the police lack any suspicion, reasonable or otherwise, that an individual has committed a crime or is involved in criminal

---

*United States v. Werking,* 915 F.2d 1404, 1408 (10 th Cir.1990). *See also United States v. Johnson,* 910 F.2d 1506, 1508 (7 th Cir.1990).

**5.** The Supreme Court of Pennsylvania recently observed that Fourth Amendment jurisprudence sets out three tiers of interaction between a citizen and the police. *See Com. v. Sierra,* 555 Pa. 170, 723 A.2d 644 (1999). The first is a "mere encounter," which need not be supported by any suspicion, and carries no official compulsion to stop or respond; the second, an "investigative detention," which must be supported by reasonable suspicion and subjects a person to a stop and a period of detention not amounting to an arrest; and third, an arrest, which must be supported by probable cause. *Id.* at 646 n. 3. *See also United States v. Johnson,* 910 F.2d 1506, 1508 (7 th Cir.1990); *United States v. Espinosa–Guerra,* 805 F.2d 1502, 1506 (11 th Cir.1986).

activity, because the Fourth Amendment simply does not apply. *Bostick*, 501 U.S. at 434–35, 111 S.Ct. at 2386; *Immigration & Naturalization Service v. Delgado*, 466 U.S. 210, 216–17, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984); *see also California v. Hodari D.*, 499 U.S. 621, 628, 111 S.Ct. 1547, 1552, 113 L.Ed.2d 690 (1991) (No seizure occurs where a reasonable person would feel free "to disregard the police and go about his business"). If the engagement between the Petitioner and the officer was merely a "consensual encounter," no privacy interests were invaded and thus the Fourth Amendment is not implicated. Even when the officers have no basis for suspecting criminal involvement, they may generally ask questions of an individual "so long as the police do not convey a message that compliance with their request is required." *Bostick*, 501 U.S. at 434–35, 111 S.Ct. at 2386. If the police, in some way, communicate to a reasonable person that he or she was not free to ignore the police presence and go about their business, then the Fourth Amendment is implicated. *Id.* at 437, 111 S.Ct. at 2387.

 The test to determine whether a particular encounter constitutes a seizure, or whether the encounter was simply a "consensual" non-constitutional event is whether a reasonable person would have felt free to leave. *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. *See also Delgado*, 466 U.S. at 215, 104 S.Ct. at 1762; *Royer*, 460 U.S. at 502, 103 S.Ct. at 1326–27. A seizure can occur by means of physical force, or show of authority along with submission to the assertion of authority. *Hodari D.*, 499 U.S. at 625–26, 111 S.Ct. at 1550 (noting that police officers could affect a seizure of a person by either physical force or by a show of authority along with submission to the assertion of authority); *see Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968) ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."). If a reasonable person would have felt free to leave, no seizure occurred. Conversely, if a reasonable person would have felt compelled to stay, a seizure took place. The focus, then, is

"whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 436, 111 S.Ct. at 2387. The key inquiry has also been characterized as whether "the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* at 437, 111 S.Ct. at 2387 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988)).

■ In making this determination, a court must apply the totality-of-the-circumstances approach, with no single factor dictating whether a seizure has occurred. *Bostick*, 501 U.S. at 437, 111 S.Ct. at 2387; *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. In the context of a traffic stop, where the purpose for the stop has been completed, the question becomes: Does the individual have an objective reason to believe that he or she was free to end the conversation or encounter with the officer and to proceed on his or her business?

■ The first question we must answer is whether the circumstances surrounding Ferris's questioning following the conclusion of his traffic stop communicated to a reasonable person "that he was not free to disregard the police presence and go about his business." *Chesternut*, 486 U.S. at 578, 108 S.Ct. at 1981. As the Supreme Court has acknowledged, there is no "litmus-paper test for distinguishing a consensual encounter from a seizure ...." *Royer*, 460 U.S. at 506, 103 S.Ct. at 1329. The Supreme Court has also observed:

> The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to "leave" will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.

*Chesternut*, 486 U.S. at 574, 108 S.Ct. at 1979. Furthermore, the Supreme Court has explained that "the test for the

existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement[s] but whether the officer's words and actions would have conveyed that to a reasonable person." *Hodari D.*, 499 U.S. at 628, 111 S.Ct. at 1551.

■ Although the inquiry is a highly fact-specific one, courts have identified certain factors as probative of whether a reasonable person would have felt free to leave. *See, e.g, United States v. McCarthur*, 6 F.3d 1270, 1275–76 (7th Cir. 1993); *United States v. Gray*, 883 F.2d 320, 322 (4th Cir.1989). These factors include: the time and place of the encounter, the number of officers present and whether they were uniformed, whether the police removed the person to a different location or isolated him or her from others, whether the person was informed that he or she was free to leave, whether the police indicated that the person was suspected of a crime, whether the police retained the person's documents, and whether the police exhibited threatening behavior or physical contact that would suggest to a reasonable person that he or she was not free to leave.

■ Based on the totality of the circumstances in this case, we hold that a reasonable person in Ferris's position would not have believed that he was free to terminate the encounter with Trooper Smith when the trooper asked him "if he would mind stepping to the back of his vehicle." In order to determine whether a reasonable person would have felt free to "disregard the police and go about his business," *see Chesternut*, 486 U.S. at 578, 108 S.Ct. at 1981, it is necessary to focus on what the person's immediate "business" was; only then may we determine if the police questioning and conduct at issue would likely have impeded that person's freedom to proceed with such business. *See Bostick*, 501 U.S. at 434, 111 S.Ct. at 2386; *Delgado*, 466 U.S. at 218, 104 S.Ct. at 1763. Ferris's immediate business was to be on his way and to continue his journey along Interstate 70. For the reasons we shall explain, we find the totality of the circumstances present in this case, at the moment Trooper Smith prolonged the

encounter beyond the scope of the initial traffic stop, to be more coercive than consensual. We thus conclude that a reasonable person in Ferris's circumstances would have reasonably believed he was neither free to leave the scene nor to ignore and disobey the police officer's "requests."

A host of factors gives rise to our determination that Trooper Smith's prolonged encounter with Ferris was a seizure under the Fourth Amendment. First and foremost is the prior existence of the initial traffic seizure of Ferris. This pre-existing seizure enhanced the coercive nature of the situation and the efficacy of the other factors in pointing toward the restriction of Ferris's liberty. *See* George M. Dery III, *"When Will This Traffic Stop End?": The United States Supreme Court's Dodge of Every Detained Motorist's Central Concern*—Ohio v. Robinette, 25 Fla. St. U.L.Rev. 519, 555 (1998). The situation faced by Ferris was markedly different from that of a person passing by or approached by law enforcement officers on the street, in a public place, or inside the terminal of a common carrier. We find significant the following circumstances: the trooper never told Ferris he was free to leave, the trooper's "request" of Ferris to exit the vehicle seamlessly [6] followed the pre-existing lawful detention, the trooper removed Ferris from his automobile, the trooper separated Ferris from the passenger, there were two uni-

---

**6.** Trooper Smith was asked on cross-examination, "And what was the next thing that you did after the citation was issued?" He responded: "I asked him if he would mind stepping to the back of his vehicle to answer some questions."

The Supreme Court of Ohio, on remand, in *State v. Robinette*, 80 Ohio St.3d 234, 685 N.E.2d 762 (1997) (*Robinette III*), reiterated the observation of the majority in *State v. Robinette*, 73 Ohio St.3d 650, 653 N.E.2d 695 (1995) (*Robinette I*), *rev'd*, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (*Robinette II*):

The *transition* between detention and a consensual exchange can be *so seamless* that the untrained eye may not notice that it has occurred. The undetectability of that transition may be used by police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obligated to allow.

*Robinette III*, 685 N.E.2d at 770–71 (quoting *Robinette I*, 653 N.E.2d at 698 (emphases added)).

formed law enforcement officers present, the police cruiser emergency flashers remained operative throughout the entire encounter, and it was 1:30 a.m. on a dark, rural interstate highway. Given the cumulative effect of these circumstances, a reasonable person would not have felt free to terminate the encounter.

The pre-existing detention of Ferris, properly sustained by the probable cause for the speeding violation, combined with the other factors we have identified, leads to the conclusion that a reasonable person in Ferris's position would believe that continued submission to Trooper Smith was required. Although in this case Trooper Smith returned Ferris's driver's license and registration, that fact alone is not dispositive of whether the trooper's conduct was coercive. The moment at which a traffic stop concludes is often a difficult legal question, not readily discernible by a layperson. It is not sound to categorically impute to all drivers the constructive knowledge as to the precise moment at which, objectively, an initially lawful traffic stop terminates, *i.e.,* the time at which the driver may depart. The trooper's immediate transition into the inquiry was so seamless that a reasonable motorist would not have believed that the initial, valid seizure had concluded. *See State v. Robinette,* 80 Ohio St.3d 234, 685 N.E.2d 762, 770 (1997) (*Robinette III* ); *Royer,* 460 U.S. at 502–03, 103 S.Ct. at 1327; Christo Lassiter, *Eliminating Consent from the Lexicon of Traffic Stop Interrogations,* 27 Cap. U.L. Rev. 79, 90, 102 (1998).

▮ Second, following the conclusion of the underlying traffic stop, Trooper Smith never informed Ferris that he was free to depart. We recognize that the police are not required to inform citizens that they are free to leave before getting consent to search a motor vehicle. In *Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (*Robinette II* ), the Supreme Court rejected a *per se* constitutional requirement "that a lawfully seized defendant must be advised that he is 'free to go' before his consent to search will be recognized as voluntary." *Id.* at 35, 117 S.Ct. at 419. Nonetheless,

the Court reiterated that " 'knowledge of the right to refuse consent is one factor to be taken into account' " in determining the voluntariness, and thus constitutional validity of a defendant's purported consent. *Id.* at 38, 117 S.Ct. at 421 (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973)). Consequently, an officer's failure to advise a motorist that he or she could refuse, or was free to leave, remains a factor to be considered.[7] *See id.* at 38, 117 S.Ct. at 421. As Justice Stewart's opinion for the majority in *Mendenhall* recognized:

> [I]t is especially significant that [Mendenhall] was twice expressly told that she was free to decline to consent to the search, and only thereafter explicitly consented to it. Although the Constitution does not require proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search, *such knowledge was highly relevant to the determination that there had been consent.* And, perhaps more important for present purposes, the fact that the officers themselves informed [Mendenhall] that she was free to withhold her consent substantially lessened the probability that their conduct could reasonably have appeared to her to be coercive.

*Id.* at 558–59, 100 S.Ct. at 1879 (internal quotation marks and citation omitted) (emphasis added).

Other Courts similarly have recognized that the failure by law enforcement to inform a citizen that he or she is free to terminate the encounter is a significant factor suggesting a continued seizure under the Fourth Amendment. *See, e.g., United States v. Washington,* 151 F.3d 1354, 1357 (11th Cir. 1998) ("Absent some positive indication that they were free not to cooperate, it is doubtful a passenger would think he or she had the choice to ignore the police presence."); *United States v. Glover,* 957 F.2d 1004, 1009 (2nd Cir.1992); *Buffkins v. City of Omaha,* 922 F.2d 465, 469 (8th Cir.1990); *United States v. Hill,* 626 F.2d 429, 435–36 (5th Cir.1980); *Guadalupe*

---

7. We emphasize that under the totality-of-the-circumstances analysis, the failure to advise motorists that they are free to leave does not by itself determine whether a seizure has occurred.

*v. United States*, 585 A.2d 1348, 1359 & n. 22 (D.C.1991); *State v. Dezso*, 512 N.W.2d 877, 881 (Minn.1994). Hence, while under *Robinette II*, 519 U.S. 33, 117 S.Ct. 417, Trooper Smith was not obligated by the United States Constitution to advise Ferris that he was free to go, nonetheless he ran the risk that his not doing so might imperil the constitutional validity of any further investigation.[8]

Many courts and commentators have expressed notions similar to the Supreme Court's acknowledgment that "few motorists would feel free ... to leave the scene of a traffic stop without being told they might do so." *Berkemer*, 468 U.S. at 436, 104 S.Ct. at 3148. For instance, the Supreme Court of Colorado has observed:

---

8. In *State v. Robinette*, 80 Ohio St.3d 234, 685 N.E.2d 762 (1997) (*Robinette III*), the Ohio Supreme Court made clear that although a police officer is not required to inform a citizen that he or she is free to leave following the completion of an ordinary traffic stop,

> [i]f police wish to pursue a policy of searching vehicles without probable cause or reasonably articulable facts, the police should ensure that the detainee knows that he or she is free to refuse consent despite the officer's request to search or risk that any fruits of any such search might be suppressed. While we are not mandating any bright-line test or magic words, when a police officer informs a detainee that he or she does not have to answer further questions and is free to leave, that action would weigh persuasively in favor of the voluntariness of the consent to search. As noted in the amicus brief of Americans for Effective Law Enforcement filed with the United States Supreme Court:
>
> > Such a warning may be good police practice, and indeed amicus knows that many law enforcement agencies among our constituents have routinely incorporated a warning into their Fourth Amendment consent forms that they use in the field, but [it] is precisely that—a practice and not a constitutional imperative. An officer who includes such a warning in his request for consent undoubtedly presents a stronger case for a finding of voluntariness in a suppression hearing, and we would suggest that such agencies and officers do otherwise. We know, too, that instructors in many police training programs of leading universities and management institutes routinely recommend such warnings as a sound practice, likely to bolster the voluntariness of a consent to search. [We ourselves] conduct [ ] law enforcement training programs at the national level and many of our own speakers have made this very point.
>
> *Id.* at 771 n. 6.

Since most of those factors [differentiating an investigatory stop from a consensual encounter] are generally present during a traffic stop, the driver of a stopped vehicle therefore is not likely to feel free to terminate the police encounter. "[I]t strains credulity to imagine that any citizen, directly on the heels of having been pulled over to the side of the road by armed and uniformed police officers in marked patrol cars, would ever feel 'free to leave' or 'at liberty to ignore the police presence and go about his business[.]' " *State v. Retherford,* 93 Ohio App.3d 586, 639 N.E.2d 498, 507 (1994) (quoting *Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991)). *People v. In Interest of H.J.,* 931 P.2d 1177, 1181 (1997) (*en banc* ) (alterations in original). Professor LaFave similarly emphasized this point: "Given the fact that [the driver] quite clearly had been seized when his car was pulled over, the return of [his] credentials hardly manifests a change in status when it was *immediately* followed by interrogation concerning other criminal activity." 3 W.R. LAFAVE, SEARCH AND SEIZURE, A TREATISE ON THE FOURTH AMENDMENT, § 9.3(a) at 112 (2d ed.1987) (footnote omitted) (emphasis added). *Accord People v. Valenzuela,* 28 Cal.App.4th 817, 33 Cal.Rptr.2d 802, 805–06 (1994); *Commonwealth v. Torres,* 424 Mass. 153, 674 N.E.2d 638, 642 (1997).

 Third, Trooper Smith affirmatively sought to move Ferris from the relative comfort of his vehicle to a more coercive atmosphere between the Camry and the two patrol cars.[9] *See* Dery, *supra,* at 556 (Having the driver "exit his vehicle ... shifts control away from the driver to the officer. No longer could [the driver] simply turn the ignition key and drive away. Instead, in order to leave, he had to affirmatively

---

9. We note that ordinarily a police officer may order someone out of a car when incident to a traffic stop. *See Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). The State does not attempt to justify the removal of Ferris from his auto on the basis of *Mimms* and instead relies on either reasonable, articulable suspicion or consent. Indeed, in the instant case, the purpose of the stop had been completed and the rationale of *Mimms* is inapplicable.

reverse an action previously requested by the officer—he had to *get back into* his car.") (footnotes omitted). As the United States Court of Appeals for the Fifth Circuit reasoned, "a request that an individual move in some manner has been consistently regarded by this Court as persuasive evidence that a fourth amendment seizure has occurred." *United States v. Gonzales,* 842 F.2d 748, 752 (5 th Cir.1988), *overruled on other grounds, United States v. Hurtado,* 905 F.2d 74 (5 th Cir.1990) (*en banc* ). *Cf. United States v. Bloomfield,* 40 F.3d 910, 917 (8 th Cir.1994) (noting that "transporting a suspect to another location . . . can create an arrest."). The record does not support a finding that any legitimate law enforcement purpose which justified the initial detention was furthered by the removal of Ferris from his automobile. *See Royer,* 460 U.S. at 505, 103 S.Ct. at 1328 ("The record does not reflect any facts which would support a finding that the legitimate law enforcement purposes which justified the detention in the first instance were furthered by removing Royer to the police room prior to the officer's attempt to gain his consent to a search of his luggage.").

Fourth, the presence of two uniformed law enforcement officers increased the coerciveness of the encounter. Not only had the second officer, Deputy Martin, been present for several minutes before Trooper Smith ended the traffic stop but the record also indicates that the deputy had positioned himself at the passenger side of the car when Trooper Smith asked Ferris to exit the Camry. Moreover, the "flashers" of the deputy's patrol car were activated as, it is fair to infer, were the emergency lights of Trooper Smith's police cruiser.

Finally, we note the geographic and temporal environment of the encounter: late at night on the side of a presumably desolate, rural interstate highway. The time and location of the encounter would have been unsettling to a reasonable person in Ferris's position. Consequently, the physical environment of the encounter between Trooper Smith and Ferris heightened the coerciveness of the encounter.

We emphasize that, although, standing alone, no single circumstance would have transformed the encounter into a Fourth Amendment seizure, the collective coerciveness of the totality of those circumstances rose to the level of a show of authority such that a reasonable person in Ferris's position would not have felt free to terminate the encounter with Trooper Smith at the moment the trooper asked him "if he would mind stepping to the back of his vehicle." Accordingly, we hold that Trooper Smith, having lawfully detained Ferris pursuant to a valid traffic stop, seized him within the meaning of the Fourth Amendment when, immediately after completing the traffic stop, he asked Ferris to get out of his car and began to question him about possible criminal activity unrelated to that which gave rise to the initial, completed traffic stop. In short, the Petitioner was seized, for a second time, when he was asked to exit his car.

### III.

Because Trooper Smith's further detention of Ferris exceeded the scope of the traffic stop's underlying justification and constituted a second seizure, in order to be lawful, the continued detention—or second stop—must be supported by reasonable, articulable suspicion.

The United States Constitution requires that the "police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) (footnote omitted). Once Ferris was seized, the reasonableness of any intrusion is measured against an objective standard: whether a reasonably prudent person in the officer's position would have been warranted in believing that Ferris was involved in criminal activity that was afoot. *Derricott v. State*, 327 Md. 582, 588, 611 A.2d 592, 595 (1992); *see Graham v. State*, 325 Md. 398, 407, 601 A.2d 131, 135 (1992); *State v. Lemmon*, 318 Md. 365, 376, 568 A.2d 48, 52 (1990). "Due weight must be given 'not to [an officer's] inchoate and unparticularized suspi-

cion or 'hunch,' but to 'the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.' " *Derricott*, 327 Md. at 588, 611 A.2d at 596 (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883); *see Jones v. State*, 319 Md. 279, 287, 572 A.2d 169, 173–74 (1990).

In *United States v. Sokolow*, 490 U.S. 1, 7–8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989), the Supreme Court observed that a determination of reasonable suspicion was "one of the relatively simple concepts embodied in the Fourth Amendment." The Court also recognized that a flexible concept such as reasonable suspicion is not easily, or even usefully, reduced to a rigid analytical framework or a set of specific, bright-line rules. *Id.* at 7, 109 S.Ct. at 1585. The *Sokolow* Court further reiterated that any determination of reasonable suspicion must be based upon " 'the totality of the circumstances—the whole picture.' " *Id.* at 8, 109 S.Ct. at 1585 (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). Moreover, this Court has repeatedly confirmed that "the level of suspicion necessary to constitute reasonable, articulable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence and obviously less demanding than that for probable cause." *Graham*, 325 Md. at 408, 601 A.2d at 135–36 (internal quotation marks and citations omitted). Finally, the Supreme Court has declared that "the ultimate questions of reasonable suspicion and probable cause to make a warrantless search should be reviewed de novo." *Ornelas v. United States*, 517 U.S. 690, 691, 116 S.Ct. 1657, 1659, 134 L.Ed.2d 911 (1996).

In this case, the State relies primarily on the following factors to justify the detention of Ferris after the completion of the traffic stop: (1) Ferris's eyes were extremely bloodshot; (2) Trooper Smith smelled no alcohol emanating from Ferris or the vehicle; (3) Ferris was nervous; and (4) both Ferris and his passenger, Discher, were moving around and looking toward the police vehicle frequently. In addition, the State has pressed before this Court the fact that Trooper Smith was cognizant of Petitioner's excessive rate of speed as he proceed-

ed to question him further immediately after issuing the speeding citation.[10]

In determining whether the facts arising from the vehicle stop in this case rise to the level of reasonable suspicion, we take heed of the dual signposts established by the United States Supreme Court in *Sokolow* and *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). In *Reid*, the Court reasoned that factual circumstances which "describe a very large category of presumably innocent travelers" cannot, in and of themselves, justify a seizure. *Reid*, 448 U.S. at 441, 100 S.Ct. at 2754. By contrast, the *Sokolow* majority stated:

> *Terry* itself involved a series of acts, each of them perhaps innocent if viewed separately, but which taken together warranted further investigation ... [I]nnocent behavior will frequently provide the basis for a showing of probable cause.... That principle applies equally well to the reasonable suspicion inquiry.

*Sokolow*, 490 U.S. at 9–10, 109 S.Ct. at 1587 (internal quotation marks and citations omitted).

In *Karnes v. Skrutski*, 62 F.3d 485 (3ʳᵈ Cir.1995), the United States Court of Appeals for the Third Circuit reconciled *Reid* and *Sokolow*. The Third Circuit reasoned that, although the factors relied upon in *Sokolow* to find reasonable suspicion were consistent with innocent travel, they were nonetheless " 'out of the ordinary.' " *Id.* at 493 (quoting *Sokolow*, 490 U.S. at 8, 109 S.Ct. at 1586). *Karnes* empha-

---

**10.** The State would likewise have us consider the early morning hour as another factor for determining the existence *vel non* of reasonable suspicion on the part of Trooper Smith at the time a seizure occurred. Because there are countless reasons for the use of the state's modern highway system at all hours of the day or night by any and all persons, we do not think it valuable to include such a factor within the totality of circumstances. This is not to say that time of day should never be included in the court's calculus, for there clearly are some situations in which time is an important consideration. For example, where police observe an unknown person in the vicinity of private property at three o'clock in the morning, the time of day would justifiably be included among the totality of circumstances to be considered in adjudging reasonable suspicion.

sized the distinction between individual factors which are consistent with innocent travel, but nonetheless out of the ordinary, and individual factors which are both consistent with innocent travel and too commonplace to be probative in tending to show criminal activity. *Id. Accord United States v. Lambert*, 46 F.3d 1064, 1069 (10 th Cir.1995). *See also United States v. Alarcon–Gonzalez*, 73 F.3d 289, 293 (10 th Cir.1996). The Third Circuit's decision in *Karnes* also recognized that the reasonable suspicion standard, as applied to the totality of the circumstances, must be narrow enough to eliminate a great number of objectively innocent individuals:

> *Reid* and *Sokolow*, taken together, demonstrate it is not enough that law enforcement officials can articulate reasons why they stopped someone if those reasons are not probative of behavior in which few innocent people would engage—the factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied.

*Karnes*, 62 F.3d at 493.

▮▮▮ In applying these principles to the present case, we conclude that no reasonable, articulable suspicion existed to support a continued detention or seizure of Petitioner. The factual circumstances surrounding the encounter between Trooper Smith and Ferris fell short of establishing reasonable suspicion that Ferris was involved in criminal activity. The facts articulated by the trooper—that Ferris had exhibited extremely bloodshot eyes, nervousness, and a lack of odor of alcohol—are too weak, individually or in the aggregate, to justify reasonable suspicion of criminal activity. In the early morning hours, these factors could fit "a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Reid*, 448 U.S. at 441, 100 S.Ct. at 2754.

Trooper Smith testified that Ferris was nervous, and that he and the passenger were moving around and looking at the police car. Nervousness as a justification for probable cause

or reasonable suspicion has been the focus of many courts. *See, e.g., United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir.1998) (remarking that it is common for most people to exhibit signs of nervousness when confronted by a police officer, whether or not the person is currently engaged in illegal activity). Commenting on nervousness as a factor in the probable cause analysis, Judge Sonner, writing for the Court of Special Appeals in *Whitehead v. State*, 116 Md.App. 497, 698 A.2d 1115 (1997), observed:

> The nervousness, or lack of it, of the driver pulled over by a Maryland State trooper is not sufficient to form the basis of police suspicion that the driver is engaged in the illegal transportation of drugs. There is no earthly way that a police officer can distinguish the nervousness of an ordinary citizen under such circumstances from the nervousness of a criminal who traffics in narcotics. An individual's physiological reaction to a proposed intrusion into his or her privacy cannot establish probable cause or even grounds to suspect. Permitting citizen's nervousness to be the basis for a finding of probable cause would confer upon the police a degree of discretion not grounded in police expertise, and, moreover, would be totally insusceptible to judicial review.

*Id.* at 505, 698 A.2d at 1119 (footnote omitted). As the Supreme Court of New Jersey re-affirmed, " 'When confronted with a traffic stop, it is not uncommon for drivers and passengers alike to be nervous and excited.' " *State v. Lund*, 119 N.J. 35, 573 A.2d 1376, 1383 (1990) (quoting *State v. Schlosser*, 774 P.2d 1132, 1138 (Utah 1989)). *See also United States v. Hall*, 978 F.2d 616, 621 n. 4 (10th Cir.1992) (noting that "[w]hile a person's nervous behavior may be relevant, we are wary of the objective suspicion supplied by generic claims that a Defendant was nervous ... after being confronted by law enforcement officials, even recognizing that reasonable suspicion may be the sum of noncriminal acts and is based on the totality of the circumstances."). The innocent and the guilty may both frequently react with analogous trepidation when approached by a uniformed police officer. *United States v. Millan–Diaz*, 975 F.2d 720, 722 (10th Cir.1992).

Moreover, the record does not demonstrate that Trooper Smith had any prior interaction with Ferris and therefore he could not reasonably gauge Ferris's behavior during the traffic stop with his usual demeanor. *See United States v. Beck,* 140 F.3d 1129, 1139 (8th Cir.1998) (commenting that because officer had no prior interaction with person, officer had no measure by which to gauge behavior during traffic stop with person's usual demeanor). Furthermore, the statement that an individual appeared unusually nervous is an extremely subjective evaluation. *United States v. Fernandez,* 18 F.3d 874, 879 (10th Cir.1994). We credit the admonition by the *Millan–Diaz* court against according too much weight to the State's routine claim that garden variety nervousness accurately indicates complicity in criminal activity: "This repetitive assertion by the Government in all cases of this kind must be treated with caution." *Millan–Diaz,* 975 F.2d at 722.

Other courts have also cautioned against placing too much reliance upon a suspect's nervousness when analyzing a determination of reasonable suspicion. *See, e.g., United States v. Wood,* 106 F.3d 942, 948 (10th Cir.1997); *Gonzalez–Rivera v. Immigration & Naturalization Service,* 22 F.3d 1441, 1447 (9th Cir.1994); *Buffkins v. City of Omaha,* 922 F.2d 465, 470 n. 13 (8th Cir.1990); *United States v. Andrews,* 600 F.2d 563, 566 (6th Cir.1979), *cert. denied sub nom. Brooks v. United States,* 444 U.S. 878, 100 S.Ct. 166, 62 L.Ed.2d 108 (1979); *State v. Washington,* 623 So.2d 392, 398–99 (Ala.Crim.App. 1993); *State v. Magner,* 191 Ariz. 392, 956 P.2d 519, 524 (Ct.App.1998); *State v. DeMarco,* 263 Kan. 727, 952 P.2d 1276, 1283–84 (1998); *State v. Mendoza,* 748 P.2d 181, 184 (Utah 1987). The case at bar is not one where the suspect's nervousness can fairly be characterized as especially "dramatic," or in some other way be objectively indicative of criminal activity. *Magner,* 956 P.2d at 524–25. Ferris's unexceptional nervousness, in reaction to encountering Trooper Smith, was simply too ordinary to suggest criminal activity.

Similarly, the fact that Ferris and the passenger turned around three or four times to look back at Trooper Smith is

hardly evidence of criminal activity. In this regard, the Supreme Court of Utah persuasively observed:

> When confronted with a traffic stop, it is not uncommon for drivers and passengers alike ... to turn to look at an approaching police officer. A search based on such common gestures and movements is a mere 'hunch,' not an articulable suspicion that satisfied the Fourth Amendment.

*Schlosser,* 774 P.2d at 1138 (internal citation omitted). Additionally, in at least one other case, a court has used the fact that the occupants of a vehicle did *not* look back at the officer as a circumstance supporting a finding of reasonable suspicion. *United States v. Sharpe,* 845 F.Supp. 791, 795 (D.Kan.1994). As the United States Court of Appeals for the Ninth Circuit has recognized, allowing both a factor and its opposite to support a finding of reasonable suspicion impermissibly allows the police to detain an individual for "suspiciously innocent" behavior. *Gonzalez–Rivera,* 22 F.3d at 1446–47 ("[W]here a factor and its opposite can both be used to justify a stop, the court should not give weight to either factor." (citing *United States v. Lopez,* 564 F.2d 710, 711 (5th Cir.1977))); *accord Magner,* 956 P.2d at 526.

We agree with the observation of Judge (now Supreme Court Justice) Kennedy that, in determining reasonable suspicion, reliance in some cases "on the fact that the suspect did look at the [officer]," renders the contrary failure of a suspect to look at an officer of little importance "in light of the questionable value of the factor generally." *United States v. Muñoz,* 604 F.2d 1160, 1161 (9th Cir.1979). In this case, according to the testimony of Trooper Smith, Ferris and Discher turned to look back at the trooper three or four times. Again, this is not a case where Ferris or his passenger made furtive movements in an apparent effort to hide or conceal contraband. Trooper Smith's observation that Ferris and Discher turned around several times to look back at the trooper was within the range of normal, ordinary behavior given the circumstances of this case.

The State also relies upon Ferris's extremely bloodshot eyes, combined with the absence of the smell of alcohol, as a factor further establishing reasonable suspicion. Bloodshot eyes, in conjunction with the odor of alcohol emanating from the person, would ordinarily provide the police with reasonable suspicion that a driver was under the influence of alcohol. Conversely, in this case, the State argues that Ferris's bloodshot eyes, combined with the *absence* of alcohol, support the inference that Ferris was under the influence of a controlled substance.

The logical consequence of the State's argument is that, standing alone, extremely bloodshot eyes would always be a reliable indication that the driver of an automobile is involved in criminal activity. This defies common sense. As Judge Thieme accurately observed, dissenting in the Court of Special Appeals, "bloodshot eyes can . . . result from a variety of noncriminal circumstances, such as tiredness, allergies, or just rubbing the eyes." Of course, we do not suggest that, in another factual context, bloodshot eyes cannot be probative of criminal activity. Here, however, the officer confronted a person traveling from another state, driving late at night, on a rural interstate highway; an individual's extremely bloodshot eyes under these circumstances are not so exceptional as to indicate reasonable, articulable suspicion of criminal activity. In the absence of any testimony or scientific evidence as to some direct, observable correlation between eyes that are bloodshot, even extremely so, and drug usage or, intuitively less likely, drug possession, we find this fact to carry little, if any, weight.

In *Derricott*, 327 Md. at 591, 611 A.2d at 597, this Court recognized that a police officer, "by reason of training and experience, may be able to explain the special significance of . . . observed facts." Thus, conduct that appears innocuous to the average layperson may in fact be suspicious when observed by a trained law enforcement official. The Fourth Amendment, however, does not allow the law enforcement official to simply assert that apparently innocent conduct was

suspicious to him or her; rather, the officer must offer "the factual basis upon which he or she bases the conclusion." *Id.*

In this case, the State presented no evidence that bloodshot eyes—or excessive speed—are indicative of persons under the influence of a controlled substance. In other words, Trooper Smith did not testify that Ferris's bloodshot eyes were somehow distinct from other bloodshot eyes irritated by noncriminal causes; nor did he explain how excessive speed, without any other driving irregularity, might imply a driver's impaired operation. Nor does the record reflect that he could reasonably make such a distinction. *See Salzano,* 158 F.3d at 1112–14 (dismissing government's contention that large motor homes are commonly used by drug runners to haul drugs or that fresh evergreen wreaths are used by drug smugglers to mask scent of drugs because government presented no evidence that motor homes such as one driven by defendant is mode of transportation preferred by drug smugglers or that evergreen is used to mask the odor).

The observation of Judge McAuliffe, writing for the Court in *Derricott,* applies with equal pertinence here: "This is not a case where facts observed by the police officer take on a special meaning when viewed through the experienced eye of that officer." *Derricott,* 327 Md. at 591, 611 A.2d at 597; *see Magner,* 956 P.2d at 525 (noting that "while [the officer]'s assumptions could have been correct, his inference based on those assumptions is considerably weakened by the lack of any evidentiary support for them").

Similar to the Supreme Court's conclusion in *Reid,* Trooper Smith's reliance on Ferris's nervousness and extremely bloodshot eyes was "simply too slender a reed to support the seizure in this case." *Reid,* 448 U.S. at 441, 100 S.Ct. at 2754. In sum, we do not find the combination of circumstances present here any more suspicious than the individual items. *See United States v. Berryman,* 717 F.2d 651, 654 (1 st Cir. 1983); *see also Wood,* 106 F.3d at 948 (stating "[r]eliance on the mantra 'the totality of the circumstances' cannot metamorphose these facts into reasonable suspicion"); *United*

*States v. Sprinkle*, 106 F.3d 613, 618 (4th Cir.1997) ("Our conclusion is that the five factors cited by the government gain little, if any, strength when put together.").

The Supreme Judicial Court of Massachusetts expressed a similar sentiment in a slightly more colorful manner: "Adding up eight innocuous observations—eight zeros—does not produce a sum of suspicion that justifies a line of interrogation ... It is apparent that [the trooper] played a good hunch and fished until he caught something." *Commonwealth v. Torres*, 424 Mass. 153, 674 N.E.2d 638, 644 (1997). Accordingly, we hold that the circumstances following the completion of the traffic stop did not give rise to a reasonable suspicion that Ferris was involved in criminal activity. The evidence should have been suppressed.

We recognize the compelling interest of the public in detecting persons who traffic in illicit drugs. *See United States v. Mendenhall*, 446 U.S. 544, 561, 100 S.Ct. 1870, 1881, 64 L.Ed.2d 497 (1980) (plurality opinion). Nonetheless, "[w]e must not allow our zeal for effective law enforcement to blind us to the peril to our free society that lies in this Court's disregard of the protections afforded by the Fourth Amendment." *Florida v. Royer*, 460 U.S. 491, 513, 103 S.Ct. 1319, 1332, 75 L.Ed.2d 229 (1983) (Brennan, J., concurring).

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY OF CONVICTION FOR POSSESSION OF A CONTROLLED SUBSTANCE WITH AN INTENT TO DISTRIBUTE. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY WASHINGTON COUNTY.*

Dissenting opinion by CHASANOW, J. in which RODOWSKY, J., joins.

CHASANOW, Judge, dissenting:

The defendant was validly stopped and issued a citation by a Maryland State Trooper. Before the defendant drove away, the trooper asked the defendant: "Would you mind stepping to the back of your vehicle to answer a few questions?" This request was made immediately after the citation was signed and the defendant's license and registration were returned to him but before the defendant had time to drive away. These circumstances alone should not preclude a finding that the defendant's answers were freely and voluntarily given. In fact, the trial judge did make a finding that the defendant "voluntarily" answered the trooper's questions "without intimidation,"[1] and this fact finding was neither clearly erroneous nor constitutionally invalid. The defendant's answers unquestionably supplied probable cause for the search.

Instead of affording any deference to the trial judge's fact finding, the majority either makes its own contrary fact finding or it decides, as a matter of law, that the defendant's answers were not voluntary and the defendant was intimidated. The majority states: "We thus conclude that a reasonable person in Ferris's circumstances would have reasonably believed he was neither free to leave the scene nor to ignore and disobey the police officer's 'requests.'" 355 Md. 356, 378, 735 A.2d 491, 502 (1999). This case represents a good example of why appellate courts should not make fact findings contrary to those made by a trial judge.

As a partial basis for its appellate fact finding, the majority notes that "an officer's failure to advise a motorist that he or she could refuse, or was free to leave, remains a factor to be considered." 355 Md. at 380, 735 A.2d at 503. Having made this observation the majority proceeds to ignore it. Giving the

---

1. The majority states these fact findings "refer to the questioning at the rear of the Camry, and not to the earlier point in time when Ferris exited the Camry." 355 Md. 356, 366–67 n. 3, 735 A.2d 491, 496 n. 3 (1999). This is improperly reviewing the announced finding in the way least favorable to the State and to the judge's decision. *See Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240–41 (1990).

defendant back his license and registration could be found and was found by the trial judge to be a way of informing the defendant that he was now free to leave. Had the trooper made his "requests" before returning the license and registration or before the ticket was signed, then the defendant would not have felt free to leave; but, once the license and registration were returned and the ticket was signed, the trial judge could determine that the trooper signaled to the defendant that he was free to leave. The request for further information, made as the defendant was preparing to drive off, could be and was found by the trial judge to be a mere accosting and, as the majority recognizes, a seizure does not occur merely because an officer approaches an individual and requests the person to answer a few questions. *Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229, 239 (1983). No case has been cited, and I doubt any court has ever held that merely posing questions to a validly stopped motorist before the motorist has had an opportunity to drive away is an illegal detention as a matter of law and precludes a finding that there was no intimidation and the questions were answered voluntarily. I agree with the trial judge and the Court of Special Appeals that the trial judge did not err in finding the police officer's questions were not improper and that the defendant's answers were freely and voluntarily given. The defendant's convictions should be affirmed.

Judge RODOWSKY has authorized me to state that he joins in this dissenting opinion.