571 S.E.2d 703

**The STATE, Appellant,**

v.

**Donovan WILLIAMS, Respondent.**

No. 3550.

Court of Appeals of South Carolina.

Submitted May 6, 2002.
Decided Sept. 9, 2002.
Rehearing Denied Nov. 21, 2002.

594

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Robert E. Bogan and W. Rutledge Martin, all of Columbia; and Solicitor Ralph E. Hoisington, of N. Charleston, for appellant.

Peter David Brown, of Mount Pleasant, for respondent.

SHULER, J.:

The State appeals the trial court's ruling suppressing twenty-five pounds of marijuana found in Donovan Williams' possession as the product of an illegal search. We affirm.

## FACTS/PROCEDURAL HISTORY

On Sunday April 4, 1999, Officer Robert Blajszczak of the Moncks Corner Police Department was conducting stationary radar on Highway 52 in Berkeley County. Around 9:00 a.m. he received a "be on the lookout" dispatch involving a "green on tan" Ford Explorer allegedly being operated without the owner's consent. Soon afterward Blajszczak spotted a similar Explorer and followed it.

Because Blajszczak did not know the tag number of the suspect Explorer, he ran a license plate check. The check revealed the vehicle was registered to Dwayne Anthony Barbour and that it was not the vehicle in question. It did, however, disclose that the vehicle's license tag had been suspended for lack of insurance. As a result, Blajszczak stopped the Explorer for a possible insurance violation.

Blajszczak approached and asked the driver, Dwayne Barbour, for his driver's license, registration, and proof of insurance. As part of his standard procedure, Blajszczak ran a driver's license check and discovered that although Barbour's recent driving record was clean, his license previously had been suspended in 1995 for a controlled substance violation. Blajszczak returned and asked Barbour to step outside the vehicle while he issued a citation for the tag violation. Barbour's passenger remained seated in the vehicle.

At the rear of the vehicle, Blajszczak wrote and explained the ticket to Barbour. He then returned Barbour's license and registration and stated: "[B]efore you leave, let me ask you a few questions." Blajszczak proceeded to ask Barbour a series of questions, such as where he was coming from and where he was headed. He also asked Barbour the name of his passenger and what their relationship was.

As Blajszczak was speaking with Barbour, a K-9 officer in a marked patrol unit whom Blajszczak had radioed arrived as backup. Blajszczak directed this officer to stand with Barb-

our while he questioned Barbour's passenger, Donovan Williams. According to Blajszczak, he became suspicious when Barbour and Williams gave inconsistent answers to his questions. These inconsistencies, combined with Barbour's previous license suspension, led Blajszczak to request consent to search the vehicle.

Barbour consented to the search and Blajszczak discovered an open bottle of cognac behind the driver's seat. In the Explorer's cargo area, he found a black suitcase; Williams acknowledged ownership and consented to a search of its contents. He gave Blajszczak the key, and when Blajszczak had trouble opening the case, Williams opened it for him. Inside, Blajszczak found miscellaneous clothes and a large white block of an unknown substance. Williams admitted it was marijuana. Following verification by the canine at the scene, Blajszczak seized the item and immediately arrested Barbour and Williams. He also cited both men for the open container violation. Subsequent analysis revealed the substance to be twenty-five pounds of marijuana.

On June 30, 1999, a Berkeley County grand jury indicted Williams for trafficking more than ten pounds of marijuana. Williams moved to suppress the drug evidence, arguing it was obtained as the result of an illegal search. The trial court held a suppression hearing on July 18, 2000.

At the hearing, Blajszczak testified his normal procedure when issuing a traffic citation is to return the driver's license, explain the ticket, ask the driver if he has any questions, and then advise him to have a good or a safe day and allow him to leave. Blajszczak, however, admitted he did not follow his normal procedure in this case. In addition, Blajszczak agreed his only basis for questioning Barbour further was Barbour's prior license suspension for a drug violation. According to Blajszczak, that was a "warning sign ... or a flag."

The trial court granted Williams' motion to suppress, finding the search illegal because Blajszczak lacked reasonable suspicion to question Barbour and Williams beyond the scope of the traffic stop. The court specifically found they were not free to leave under the totality of the circumstances, because "once they get past the ticket ... anything from that point

forward is an investigation and is custodial." The State appeals this ruling.

## LAW/ANALYSIS

### Standard of Review

In *State v. Brockman*, 339 S.C. 57, 528 S.E.2d 661 (2000), our supreme court articulated the standard of review to apply to a trial court's determination that a search was private such that it did not fall within the parameters of the Fourth Amendment. In so doing, the court specifically rejected the de novo standard set forth in *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) for reviewing determinations of reasonable suspicion and probable cause in the context of warrantless searches and seizures. Instead, the court stated it would "review the trial court's ruling like any other factual finding and reverse if there is clear error," and would therefore "affirm if there is any evidence to support the ruling." *Brockman*, 339 S.C. at 66, 528 S.E.2d at 666.

Subsequently, in *State v. Green*, 341 S.C. 214, 532 S.E.2d 896 (Ct.App.2000), this Court declared that *Brockman* "determined the appellate standard of review in Fourth Amendment search and seizure cases is limited to determining whether any evidence supports the trial court's finding and the appellate court may only reverse where there is clear error." *Green*, 341 S.C. at 219 n. 3, 532 S.E.2d at 898 n. 3. Accordingly, we will apply an "any evidence" standard to the ruling below.

### Discussion

The State argues the trial court erred in suppressing the marijuana because Blajszczak "was not required to have reasonable suspicion to question" Barbour and Williams. According to the State, Blajszczak merely engaged the men in a consensual encounter and thus properly obtained consent to search. We disagree.

The Fourth Amendment guarantees "[t]he right of the people to be secure ... [from] unreasonable searches and seizures." U.S. Const. amend IV; *see State v. Butler*, 343 S.C. 198, 539 S.E.2d 414 (Ct.App.2000). "Temporary detention of individuals during the stop of an automobile by the police,

even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Thus, an automobile stop is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Id.* at 810, 116 S.Ct. 1769. Where probable cause exists to believe that a traffic violation has occurred, the decision to stop the automobile is reasonable per se. *Id.*

Williams concedes Blajszczak had probable cause to stop the Explorer. He contends, however, that once the traffic stop was concluded, Blajszczak needed a reasonable suspicion that some further criminal activity was afoot in order to begin questioning Barbour.

 Once a motor vehicle is detained lawfully for a traffic violation, the police may order the driver to exit the vehicle without violating Fourth Amendment proscriptions on unreasonable searches and seizures. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n. 6, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). In carrying out the stop, an officer " 'may request a driver's license and vehicle registration, run a computer check, and issue a citation.' " *United States v. Sullivan*, 138 F.3d 126, 131 (4th Cir.1998) (citation omitted). However, "[a]ny further *detention* for questioning is beyond the scope of the [ ] stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime." *Id.* (emphasis added); *see Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."); *Ferris v. State*, 355 Md. 356, 735 A.2d 491, 499 (1999) ("Once the purpose of [the] stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention.").[1] The question, then, is

---

**1.** Other federal and state courts have reached a similar conclusion. *See, e.g., United States v. Jones*, 234 F.3d 234, 241 (5th Cir.2000) ("The basis for the stop was essentially completed when the dispatcher notified the officers about the defendants' clean records, three minutes before the officers sought consent to search the vehicle. Accordingly, the officers should have ended the detention and allowed the defendants to leave. And the failure to release the defendants violated the Fourth Amendment."); *United States v. Beck*, 140 F.3d 1129, 1136 (8th

whether Blajszczak detained, i.e. "seized" Williams anew, thereby triggering the Fourth Amendment and possibly rendering his consent invalid, or simply initiated a consensual encounter invoking no constitutional scrutiny. *See Ferris*, 735 A.2d at 500 (stating the difficult question was whether the trooper's questioning of Ferris after he issued a citation and returned his driver's license and registration "constituted a detention, and hence raise[d] any Fourth Amendment concerns, or was merely a 'consensual encounter[ ]' ... implicating no constitutional overview").[2]

■ It is well settled that "mere police questioning does not constitute a seizure" for Fourth Amendment purposes. *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *see State v. Culbreath*, 300 S.C. 232, 237, 387 S.E.2d 255, 257 (1990) ("Not all personal encounters between policemen and citizens involve 'seizures' of persons thereby bringing the Fourth Amendment into play.") (citations omitted), *abrogated on other grounds by Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). To the contrary, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of

Cir.1998) ("Because the purposes of [the officer's] initial traffic stop of Beck had been completed ... [the officer] could not subsequently detain Beck unless events that transpired during the traffic stop gave rise to reasonable suspicion to justify [the officer's] renewed detention of Beck."); *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir.1995) ("Once the purposes of the initial traffic stop were completed, there is no doubt that the officer could not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention."); *People v. Redinger*, 906 P.2d 81, 85–86 (Colo.1995) (*en banc* ) ("When, as here, the purpose for which the investigatory stop was instituted has been accomplished and no other reasonable suspicion exists to support further investigation, there is no justification for continued detention and interrogation of citizens."); *Davis v. State*, 947 S.W.2d 240, 243 (Tex.Crim.App.1997) (*en banc* ) ("[O]nce the reason for the stop has been satisfied, the stop may not be used as a 'fishing expedition for unrelated criminal activity.' ") (citations omitted).

2. "A consensual encounter has been defined as simply the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement official. Because an individual is free to leave at any time during such an encounter, he is not 'seized' within the meaning of the [Fourth] Amendment." *Ferris*, 735 A.2d at 500 n. 4 (citations omitted).

a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19–20 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "So long as a person remains at liberty to disregard a police officer's request for information, no constitutional interest is implicated." *Sullivan*, 138 F.3d at 132 (citations omitted).

 The test for determining if a particular encounter constitutes a seizure is whether " 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (citation omitted); *see Sullivan*, 138 F.3d at 132 ("The test ... [is] whether, under the totality of the circumstances surrounding the encounter, a reasonable person in the suspect's position 'would have felt free to decline the officer's requests or otherwise terminate the encounter.' ") (citations omitted). It is necessarily imprecise, "because it is designed to assess the coercive effect of police conduct" taken as a whole. *Chesternut*, 486 U.S. at 573, 108 S.Ct. 1975. Thus, exactly what constitutes a restraint on liberty sufficient to lead a reasonable person to conclude he is not free to leave varies with the setting in which the police conduct occurs. *Id.*

 Reasonableness "is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). As a result, the nature of the reasonableness inquiry is highly fact-specific. *Id.* Although no single factor dictates whether a seizure has occurred, courts have identified certain probative factors, including the time and place of the encounter, the number of officers present and whether they were uniformed, the length of the detention, whether the officer moved the person to a different location or isolated him from others, whether the officer informed the person he was free to leave, whether the officer indicated to the person that he was suspected of a crime, and whether the officer retained the person's documents or exhibited threatening behavior or physical contact. *See United States v. Beck*, 140 F.3d 1129 (8th Cir.1998); *Ferris*, 735 A.2d at 502 (citations omitted).

 In deciding whether Williams was seized for purposes of the Fourth Amendment, it must be noted that "the deten-

tion associated with roadside searches is unlike a 'mere field interrogation' where an officer may question an individual 'without grounds for suspicion.' Roadside consent searches are instead more akin to an investigatory stop that does involve a detention." *State v. Carty,* 170 N.J. 632, 790 A.2d 903, 908 (2002) (citations omitted). As the Maryland Court of Appeals has stated, a traffic stop, or pre-existing seizure, "enhance[s] the coercive nature of the situation and the efficacy of the other factors in pointing toward the restriction" of liberty. *Ferris,* 735 A.2d at 502. Such a situation, therefore, is "markedly different from that of a person passing by or approached by law enforcement officers on the street, in a public place, or inside the terminal of a common carrier." *Id.* (citations omitted).

When asked at the suppression hearing if Barbour was free to leave before answering the additional questions, Blajszczak replied that "[t]here was nothing stopping him from leaving." While that may technically be correct, we believe Blajszczak, by prolonging the initial stop beyond its proper scope, rendered the ensuing encounter more coercive than consensual. As the Ohio Supreme Court explained:

> "The transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. The undectability of that transition may be used by police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obligated to allow."

*State v. Robinette,* 80 Ohio St.3d 234, 685 N.E.2d 762, 770–71 (1997) (citation omitted); *see Ferris,* 735 A.2d at 503 ("The moment at which a traffic stop concludes is often a difficult legal question, not readily discernible by a layperson. It is not sound to categorically impute to all drivers the constructive knowledge as to the precise moment at which, objectively, an initially lawful traffic stop terminates, *i.e.,* the time at which the driver may depart.").

█ The facts encompassing Blajszczak's questioning of Barbour and Williams support the conclusion that the men were in fact seized. Blajszczak admitted he initially asked Barbour to step to the rear of the Explorer so that he could

speak with him privately. When asked why, Blajszczak responded that it was because of his law enforcement training. In particular, Blajszczak testified he brought Barbour to the rear of the vehicle so that Williams would not "hear any questions or any answers to any questions" he was asking. He explained that he was taught to follow a line of questioning that might build to a point where he had sufficient reasonable suspicion to ask for consent to search. Hence, at this point the encounter began to assume the tenor of an investigation.

We recognize the Constitution does not require an officer to inform a motorist he is free to leave before obtaining consent. *See Robinette,* 519 U.S. at 35, 117 S.Ct. 417 (rejecting per se rule that would render consent involuntary if an officer failed to advise a motorist he was free to go before requesting consent). However, the Supreme Court in *Robinette* reiterated that such advice was one factor to consider in the overall analysis. *Id.* at 39, 117 S.Ct. 417. Significantly, in this case not only did Blajszczak fail to tell Barbour the traffic stop had concluded and he could go, he specifically stated: *"[B]efore you leave,* let me ask you a few questions." In our view, this statement indicated Barbour was not free to leave, despite Blajszczak's contrary testimony at the suppression hearing.

Furthermore, the following circumstances surrounding the encounter lend additional support to our conclusion: the roadside traffic stop; the presence of two uniformed patrol officers in marked, flashing vehicles, one of them part of a K–9 unit; the fact Blajszczak detained Barbour and Williams between twenty-five and forty minutes, as opposed to a normal stop which Blajszczak testified would last approximately nine to eleven minutes, and otherwise did not follow his usual procedure for a traffic stop; the fact Blajszczak asked Barbour to exit the Explorer so that he could talk to him and Williams separately; that Blajszczak asked the K 9 officer to stand beside Barbour at the rear of the vehicle while he questioned Williams; and the seemingly innocuous but immediate transition from the valid traffic stop such that Barbour and Williams may not have realized the initial seizure had ended.

We believe these circumstances were sufficiently intimidating such that Williams "could reasonably have believed that he

was not free to disregard the police presence and go about his business." *Chesternut,* 486 U.S. at 576, 108 S.Ct. 1975; *see People v. In Interest of H.J.,* 931 P.2d 1177, 1181 (Colo.1997) (*en banc* ) ("It strains credulity to imagine that any citizen, directly on the heels of having been pulled over to the side of the road by armed and uniformed police officers in marked patrol cars, would ever feel 'free to leave' or 'at liberty to ignore the police presence and go about his business.' ") (citations omitted); *compare Ferris,* 735 A.2d at 502–03 (enumerating several factors that transmuted a valid traffic stop into an unlawful detention, including the trooper's failure to inform Ferris he was free to leave, the trooper's "request" that Ferris step "to the back of his vehicle to answer a couple of questions," the detention seamlessly followed a pre-existing lawful stop, the trooper removed Ferris from his automobile and separated him from his passenger, the presence of two uniformed law enforcement officers, and the fact that the police cruiser emergency flashers remained operative throughout the entire encounter) (footnote omitted), *with Sullivan,* 138 F.3d at 133 (finding brief questioning of defendant after officer returned driver's license and registration was consensual and did not constitute a seizure under the Fourth Amendment; court noted that defendant remained in his own car throughout the questioning and found it significant that there was no indication the officer "employed any physical force or engaged in any outward displays of authority" indicating the defendant was being detained).

Even under the court's analysis in *Sullivan,* however, a routine stop "constitute[s] a Fourth Amendment seizure so that when the purpose justifying the stop is exceeded, the detention becomes illegal unless a reasonable suspicion of some other crime exists." *Sullivan,* 138 F.3d at 131; *see State v. Robinson,* 306 S.C. 399, 402, 412 S.E.2d 411, 413 (1991) ("To justify a brief stop [or] detention, the police officer must have a reasonable suspicion that the person has been involved in criminal activity."). Here, the only indication of a possible further crime, according to Blajszczak's own testimony, was the prior suspension of Barbour's license for a drug-related offense. This fact, of course, was in no way probative of a present crime, and thus could not serve as the basis for a reasonable suspicion. *See United States v. Jones,* 234 F.3d

234 (2000) (stating there was no reason to further detain defendants following a traffic stop because a prior arrest or criminal record alone does not amount to reasonable suspicion).

Having determined Williams was seized without reasonable suspicion, we now review the circumstances of the detention to decide whether his consent to search the suitcase was valid.

It is well settled that "[w]arrantless searches and seizures are reasonable within the meaning of the Fourth Amendment when conducted under the authority of voluntary consent." *Palacio v. State*, 333 S.C. 506, 514, 511 S.E.2d 62, 66 (1999). Undoubtedly, a law enforcement officer may request permission to search at any time. However, when an officer asks for consent to search *after* an unconstitutional detention, the consent procured is per se invalid unless it is "both voluntary *and* not an exploitation of the unlawful [detention]." *State v. Robinson*, 306 S.C. 399, 402, 412 S.E.2d 411, 414 (1991); *see Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) ("We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' ") (citation omitted); *Brown v. State*, 188 Ga.App. 184, 372 S.E.2d 514, 516 (1988) ("[I]n order to eliminate any taint from an [illegal] seizure or arrest, there must be proof both that the consent was voluntary and that it was not the product of the illegal detention."). As the Georgia Court of Appeals stated in *Brown:*

> Proof of a voluntary consent alone is not sufficient. The relevant factors include the temporal proximity of [the] illegal seizure and consent, intervening circumstances, and the purpose and flagrancy of the official misconduct.

*Brown,* 372 S.E.2d at 516.

In the instant case, we need not determine whether Williams' consent was voluntary, because the record clearly reflects it was obtained through Blajszczak's exploitation of

the unlawful detention. Blajszczak's testimony before the trial court revealed that a minimal amount of time passed between the seizure and ensuing consent, there were no intervening or attenuating circumstances, and, as we have already decided, Blajszczak's actions in detaining Barbour and Williams had no legal basis. Although the trial court failed to reach the issue of consent, the record unquestionably supports finding Williams' consent invalid. *See id.; Robinson,* 306 S.C. at 402, 412 S.E.2d at 414; *Brown,* 372 S.E.2d at 516 ("[W]e find that there was no significant lapse of time between the unlawful detention and the consent, that no intervening circumstances dissipated the effect of the unlawful detention and that the deputy's conduct had no arguable legal basis. Therefore, we hold that the consent was the product of the illegal detention, and that the taint of the unreasonable stop was not sufficiently attenuated."); *State v. Aleksey,* 343 S.C. 20, 538 S.E.2d 248 (2000) (stating an appellate court may affirm for any reason appearing in the record on appeal).

The marijuana found in Williams' suitcase was discovered through an illegal detention accompanied by a lack of valid consent. The trial court, therefore, did not err in suppressing the evidence. *See Robinson,* 306 S.C. at 402, 412 S.E.2d at 414 (suppressing drug evidence as the fruit of an unlawful stop because no attenuating circumstances removed the taint of the illegality from the consent to search); *State v. Greene,* 330 S.C. 551, 559, 499 S.E.2d 817, 821 (Ct.App.1997) ("The fruit of the poisonous tree doctrine holds that where evidence would not have come to light but for the illegal actions of the police, and the evidence has been obtained by the exploitation of that illegality, the evidence must be excluded."); *People v. Brownlee,* 186 Ill.2d 501, 239 Ill.Dec. 25, 713 N.E.2d 556 (1999) (suppressing marijuana as fruit of an illegal detention, where officers legitimately stopped vehicle for investigation of a traffic violation but after returning driver's license and insurance card and stating no citation would be issued officers paused for a couple of minutes and then asked for and obtained consent to search the vehicle, because during this time the driver and his passengers were detained without reasonable suspicion of any criminal activity).

**AFFIRMED.**

HEARN, C.J., and CONNOR, J., concur.