610 S.E.2d 846

**The STATE, Respondent,**

v.

**Timothy JONES, Appellant.**

**No. 3961.**

Court of Appeals of South Carolina.

Submitted Feb. 1, 2005.

Decided March 14, 2005.

---

Acting Deputy Chief Attorney Wanda P. Hagler, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, and Assistant Attorney General David A. Spencer, all of Columbia;  and Solicitor Harold W. Gowdy, III, of Spartanburg, for Respondent.

HUFF, J.:

Appellant, Timothy Jones, was tried for and convicted of trafficking in crack cocaine.  He appeals, asserting the trial judge erred in failing to suppress the drug evidence because it was tainted fruit seized in an illegal detention.  We affirm.[1]

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

## FACTUAL/PROCEDURAL BACKGROUND

At the start of the case, Jones made a pretrial motion to suppress the drug evidence in this case arguing it was the result of a prolonged detention that became unlawful. Jones asserted the officer, who pulled Jones over for speeding, exceeded the scope of the stop when he questioned Jones and requested backup for the purpose of searching the vehicle. The court held an in camera hearing, at which time the State presented the testimony of Trooper J. Ryan Elrod.

Trooper Elrod first testified to his normal procedure when pulling a car over for speeding. He stated that he generally calls in the traffic stop to dispatch, approaches the vehicle, speaks to the driver, and then directs the driver to get out of the car and stand at the left front wheel of the patrol car. He then asks "where they're going, if they realize their speed, where they're coming from, . . . why they're in a hurry, is there any reason for their speed. . . ." He requests license, registration, and proof of insurance. On average, with no unusual circumstances, the normal traffic stop takes him five to six minutes.

Trooper Elrod testified that, at approximately 1:30 p.m. on September 25, 2001, he was on I–85 in Spartanburg County patrolling northbound traffic for speeding violations when he observed an automobile traveling the interstate at a high rate of speed. His radar indicated the car was traveling 82 miles an hour in the 70 mile an hour zone. Trooper Elrod pulled the car over, walked up to the driver's side, explained to the driver why he had stopped him, and asked the driver to step back to the patrol vehicle while he issued him a summons for speeding. The driver of the vehicle was Timothy Jones. Trooper Elrod described the weather as mild, breezy, and very cool for that time of year. Jones exited the vehicle and walked back to the trooper's car as requested.

While in the process of issuing the traffic ticket, Trooper Elrod asked Jones where he and the other occupants of the vehicle were coming from, and Jones indicated they had been in Greenville to visit his cousin regarding opening up a barber-shop business. He first told the trooper they had stayed in a hotel, but could not tell him the name or location of the hotel. He then told Trooper Elrod they stayed with his cousin, but

he could not give the trooper his cousin's name or the location of his cousin's residence.

Jones presented the trooper with a driver's license, but did not produce registration for the vehicle. Jones appeared very nervous. The driver's license came back clear, but since Jones did not have his registration, Trooper Elrod returned to the vehicle, looked at the vehicle identification number, and then went over to the passenger to request assistance in locating the registration. After fumbling through some paperwork, the front seat passenger, Mr. Patterson, produced the registration. During this time, Trooper Elrod asked Patterson where they had been. Patterson responded they had been to Spartanburg for the last two days, but he could not remember where in Spartanburg. As Trooper Elrod spoke to Patterson, the back seat passenger, Mr. Clark, stated something to the trooper which could not be heard due to the noise on the interstate. Trooper Elrod shut the front passenger door, opened up the rear door, and asked Clark what he had said. Clark then stated they had been in Atlanta that morning, not Spartanburg.

At that point, Trooper Elrod closed the door to the car and called for any unit in the area to come to his location. His call for backup occurred approximately seven minutes into the stop. Just prior to requesting backup, Trooper Elrod asked Jones if there were any weapons or anything else in the vehicle he needed to know about and Jones answered there were not. The trooper then asked if Jones had any problem with him searching the vehicle and Jones responded he had no problem with that.

It took about three to four minutes for the back-up officer, Trooper Earle, to arrive on the scene. During this time, Trooper Elrod continued to fill out the paperwork on Jones' speeding ticket. The trooper was in the process of explaining the ticket to Jones when he observed the front seat passenger, Patterson, jump out of the vehicle with a white towel in his hand. This occurred almost simultaneously with the point at which Trooper Earle arrived on the scene. Trooper Earle began a foot pursuit of Patterson while Trooper Elrod pursued in his car. The officers were able to catch Patterson after he ran into some briars. During the chase, Trooper

Elrod observed Patterson throwing objects into the briars. The objects retrieved were bags containing white, powdery substances, which were later determined to be 230.83 grams of crack cocaine.

When asked why he called for back-up, the trooper explained:

I had three different stories on where they had been. I was by myself. The driver of the vehicle, Mr. Jones, was, in my opinion, was very uneasy. He was sweating profusely. Again, it was a cool day. He acted very nervous. And it was one on three, and regardless of the situation, I felt that I needed back-up at the scene, and——I just didn't feel something was right, and in my safety, I called for back-up.

Trooper Elrod admitted that part of the reason he called for backup was that he would need a secondary officer to search the vehicle, but denied that his purpose in talking with Jones was to wait for backup to arrive. Rather, he stated he was in the process of writing the citation and explaining it to Jones when Patterson jumped from the car and ran.

Jones argued to the trial judge that the officer had gone on a "fishing expedition" and prolonged his detention for the purpose of performing a search. He asserted the questioning of the passengers and the extended conversation the officer had with him about where they had been and what they were doing was merely a "ruse" so he could eventually search the car. Jones maintained "anything this officer did with [him] pursuant to this stop after a reasonable period of time had expired for him to issue him the summons ... [was] unreasonable" and was therefore an illegal detention.

The trial judge found the amount of time of this traffic stop was not too long and that it was a legal stop and detention. He determined, because Jones did not initially produce the registration, the officer had the right to check the vehicle identification number and ask the passenger to help him look for the registration. He found no constitutional violation with the casual conversation the officer carried on with the passenger while he looked for the registration. He further determined whether Jones gave consent to search the vehicle was irrelevant inasmuch as there was no search carried out pursuant to the alleged consent since Patterson jumped out of the

car and ran, throwing objects to the ground after having been detained for, at most, around eleven minutes. The trial judge therefore denied the motion to suppress.

## LAW/ANALYSIS

Jones appeals his conviction arguing the trial judge erred in denying his motion to suppress the crack cocaine recovered in this case because it was tainted fruit seized as the result of an illegal detention. We disagree.

Jones relies largely on the case of *State v. Williams*, 351 S.C. 591, 571 S.E.2d 703 (Ct.App.2002), asserting when the officer obtained his registration and license and the license check revealed nothing, the investigatory purpose of the speeding ticket was complete. He thus argues his questioning, along with that of the two passengers, as well as the call for backup amounted to an illegal detention exceeding the scope of the traffic stop.

In *Williams*, a police officer stopped a vehicle for a possible insurance violation and discovered the vehicle's tag had been suspended for lack of insurance. The officer ran a license check on the driver and found, although his driving record was clean at that time, the driver's license had previously been suspended for a controlled substance violation. The officer asked the driver to step outside the vehicle while he issued a citation for the tag violation. The officer wrote and explained the ticket to the driver and returned the license and registration to the driver stating, "Before you leave, let me ask you a few questions." The officer then proceeded to ask the driver a series of questions, including where he was coming from and where he was headed. He also asked the driver the name of his passenger and what their relationship was. As the officer was speaking with the driver, a K–9 officer arrived after a request for backup was made. The officer who made the traffic stop then began to question the passenger, Williams. When Williams gave inconsistent answers to that of the driver, these inconsistencies, along with knowledge of the driver's previous license suspension, led the officer to request consent to search the vehicle. The officers ultimately found a twenty-five pound block of marijuana in a suitcase to which Williams had acknowledged ownership. At a pretrial hearing, the officer

admitted he did not follow his normal procedure when issuing a traffic citation of returning the driver's license, explaining the ticket, asking the driver if he has any questions, and allowing the driver to then leave. The officer further agreed his only basis for questioning the driver further was the driver's previous license suspension for a drug violation. *Id.* at 595–96, 571 S.E.2d at 705–06.

The trial judge in *Williams* granted the motion to suppress finding the search was illegal because the officer lacked reasonable suspicion to question the driver and Williams beyond the scope of the traffic stop. *Id.* at 596, 571 S.E.2d at 706. The State appealed, and this court affirmed, finding "[t]he marijuana found in Williams' suitcase was discovered through an illegal detention accompanied by a lack of valid consent." *Id.* at 605, 571 S.E.2d at 711.

We find *Williams* to be easily distinguishable from the case at hand. In *Williams,* the driver and passenger were clearly detained beyond the scope of the traffic stop. There, the officer had written and explained the ticket to the driver and had returned his license and registration before he began questioning the driver. We further noted in *Williams* that the driver and passenger had been detained between twenty-five and forty minutes as opposed to the officer's normal stop time of nine to eleven minutes, and the officer there did not otherwise follow his normal procedure for a traffic stop. *Id.* at 602, 571 S.E.2d at 709. In *Williams,* we held:

> Once a motor vehicle is detained lawfully for a traffic violation, the police may order the driver to exit the vehicle without violating Fourth Amendment proscriptions on unreasonable searches and seizures. *Pennsylvania v. Mimms,* 434 U.S. 106, 111 n. 6, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). In carrying out the stop, an officer " 'may request a driver's license and vehicle registration, run a computer check, and issue a citation.' " *United States v. Sullivan,* 138 F.3d 126, 131 (4th Cir.1998) (citation omitted). However, "[a]ny further *detention* for questioning is beyond the scope of the [ ] stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime." *Id.* (emphasis added); *see Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) ("[A]n investigative detention must be temporary and last no longer

than is necessary to effectuate the purpose of the stop."); *Ferris v. State,* 355 Md. 356, 735 A.2d 491, 499 (1999) ("Once the purpose of [the] stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention."). The question, then, is whether Blajszczak detained, i.e. "seized" Williams anew, thereby triggering the Fourth Amendment and possibly rendering his consent invalid, or simply initiated a consensual encounter invoking no constitutional scrutiny. *See Ferris,* 735 A.2d at 500 (stating the difficult question was whether the trooper's questioning of Ferris after he issued a citation and returned his driver's license and registration "constituted a detention, and hence raise[d] any Fourth Amendment concerns, or was merely a 'consensual encounter[ ]' . . . implicating no constitutional overview").

*Id.* at 598–99, 571 S.E.2d at 707–08.

▮ In the case at hand, there is no question but that the vehicle was detained lawfully for a traffic violation and Trooper Elrod was allowed to request Jones exit the vehicle without violating Fourth Amendment proscriptions on unreasonable searches and seizures. Unlike the *Williams* case, there was no *further detention* for questioning beyond the scope of the stop here. Trooper Elrod did not question Jones and his passengers *after* he had returned Jones' license and registration. To the contrary, Trooper Elrod had not completed the issuance of the traffic ticket, and the purpose of the original stop had not yet been fulfilled when Patterson jumped from the car and ran, throwing objects to the ground. Although Jones alluded in his argument to the trial judge that Trooper Elrod essentially extended the stop beyond a reasonable time by going on a "fishing expedition" prior to the issuance of the ticket, there is evidence to support the trial judge's determination that the detention was not for an unreasonably long time, the extension of time was attributable to the additional time required in obtaining the car registration, and the questions asked of Jones and the passengers did not exceed the scope of the traffic stop such as would convert the stop into an illegal detention.

We find further support for our decision in the recent United States Supreme Court decision *Illinois v. Caballes,* —— U.S. ——, 125 S.Ct. 834, 160 L.Ed.2d 842, 2005 WL 123826

(2005). In *Caballes,* a trooper stopped motorist Caballes for speeding on an interstate. When the officer reported the traffic stop to dispatch, a second trooper overheard the transmission and immediately headed for the scene with his narcotics-detection dog. The first trooper had Caballes in his patrol car and was in the process of writing a warning ticket when the second trooper walked the dog around Caballes' vehicle and the dog alerted at the trunk. A subsequent search of the trunk resulted in the discovery of marijuana. The trial judge, finding the officers had not unnecessarily prolonged the stop, denied Caballes' motion to suppress the evidence, and Caballes was convicted of a narcotics offense. The Appellate Court affirmed, but the Illinois Supreme Court subsequently reversed the conviction finding the use of the dog unjustifiably enlarged the scope of a routine traffic stop. *Id.* at *1, 125 S.Ct. at 835–36. The U.S. Supreme Court vacated and remanded, noting they "accept[ed] the state court's conclusion that the duration of the stop ... was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop." *Id.* at *2, 125 S.Ct. at 837.

In the case at hand, there is evidence to support the trial judge's findings and we cannot say his findings are clearly erroneous. We therefore find no abuse of discretion. *See State v. Wilson,* 345 S.C. 1, 5–6, 545 S.E.2d 827, 829 (2001) (holding in a criminal case the appellate court is bound by the trial court's preliminary factual findings in determining the admissibility of certain evidence unless the findings are clearly erroneous, and its review extends only to determining whether the trial judge abused his discretion); *State v. Green,* 341 S.C. 214, 219 n. 3, 532 S.E.2d 896, 898 n. 3 (Ct.App.2000), (holding "the appellate standard of review in Fourth Amendment search and seizure cases is limited to determining whether any evidence supports the trial court's finding and the appellate court may only reverse where there is clear error.").

For the foregoing reasons, Jones' conviction is

**AFFIRMED.**

GOOLSBY and STILWELL, JJ., concur.