725 S.E.2d 523

**The STATE, Respondent,**

v.

**Alfred ADAMS, Appellant.**

**No. 4964.**

Court of Appeals of South Carolina.

Heard Feb. 14, 2012.
Decided April 25, 2012.
Rehearing Denied July 28, 2012.

Appellate Defender Robert M. Pachak, of Columbia, for Appellant.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Salley W. Elliott, and Assistant Attorney General Deborah R. J. Shupe, all of Columbia; and Solicitor Donald V. Myers, of Lexington, for Respondent.

THOMAS, J.

Alfred Adams appeals his conviction for trafficking cocaine. He argues the trial court erred in refusing to suppress drugs found on his person during a traffic stop. We affirm.

## FACTS AND PROCEDURAL HISTORY

In July 2008, the North Charleston Police Department (the Department) learned that Adams was involved in a shooting and attempted robbery associated with a drug deal. Based on further investigation, the Department believed Adams was a drug dealer whose source of supply was in Atlanta, Georgia. The Department consequently installed a tracking device [1] on Adams's vehicle while the vehicle was parked in a public parking garage. The Department did not seek a warrant or judicial order before installing the device.

Five days later, the Department learned from the device that Adams's vehicle traveled to Atlanta, remained in that area for less than an hour, and began returning toward Charleston on Interstate 26.[2] Around 11:55 p.m., the Department contacted Sergeant Timothy Blair, who was accompanied by his drug dog and sitting in his cruiser at a rest area off of the interstate. The Department instructed Sergeant Blair to "be on the lookout" for the vehicle and stop it if it violated any traffic laws. As Sergeant Blair entered the interstate, he spotted the vehicle and observed it change lanes twice without using a turn signal. Sergeant Blair initiated a traffic stop at 11:57 p.m., and the vehicle pulled into a gas station.

Sergeant Blair approached the driver's side of the vehicle without his drug dog. Adams was driving, and Sergeant Blair advised him of the violations. At that time, Adams "was acting very nervous. He had his hands down below where [Sergeant Blair] couldn't see them." Sergeant Blair asked Adams to keep his hands visible and noticed another vehicle

---

1. The tracking device was the size of a pack of cigarettes, ran on its own battery, and sent information detailing its position to the Department via satellite. The Department installed the device by magnetically attaching it to the vehicle's undercarriage. The device did not provide any information other than the vehicle's location.

2. The Department did not learn this information from any other source.

turn into the gas station as he initiated the stop. Sergeant Blair was worried the second vehicle was a "trail vehicle" because the driver was watching the traffic stop, acting "kind of panicky, looking back and forth," and "fidgeting with his jacket." Sergeant Blair requested backup out of concern for his safety.

Officer James Greenawalt arrived approximately three minutes later. He removed Adams from the vehicle and began a license check. Meanwhile, Sergeant Blair used his dog to conduct a perimeter sniff of the vehicle. During this period, Adams repeatedly attempted to talk to the officers, and his eyes "were looking in other directions like trying to make a way for escape." The dog alerted at the driver's door and then on the driver's seat and center console.[3]

After the dog alerted, Officer Greenawalt began to pat down Adams for weapons. In doing so, he felt a "jagged, round object" in Adams's groin area that his training and experience led him to believe was drugs. He placed Adams in handcuffs and retrieved the item, which was 141.62 grams of packaged cocaine. The license check was not complete when the dog alerted and ensuing pat-down occurred. The drugs were found a little less than 8 minutes after Adams was pulled over. Adams was never issued a citation for the traffic violations.

A Charleston County grand jury indicted Adams for trafficking cocaine. During pretrial motions, Adams moved to suppress the drugs, alleging the Department failed to obtain a warrant or court order before installing the tracking device pursuant to the Fourth Amendment and section 17–30–140 of the South Carolina Code (Supp.2011). The trial court agreed that the Department violated the statute. However, the court held the violation did not warrant suppression of the evidence without a corresponding constitutional violation. Relying on *United States v. Knotts*, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), the court held that the use of the tracking device was not a search. Moreover, the court held the traffic stop, pat-down, and retrieval of the drugs did not violate Adams's Fourth Amendment rights. Thus, the court found no

---

**3.** The first alert occurred five to six minutes after Adams was pulled over.

constitutional violation occurred, and the motion to suppress was denied.

Adams was found guilty and sentenced to twenty-five years' imprisonment and a $50,000 fine. This appeal followed.

## ISSUE ON APPEAL

Did the trial court err in denying Adams's motion to suppress?

## STANDARD OF REVIEW

"The admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion. An abuse of discretion occurs when the trial court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support." *State v. Wright*, 391 S.C. 436, 442, 706 S.E.2d 324, 326 (2011) (citation and internal quotation marks omitted). In Fourth Amendment search and seizure cases, "an appellate court must affirm if there is any evidence to support the ruling. The appellate court will reverse only when there is clear error." *Id.* (citation and internal quotation marks omitted).

## ANALYSIS

Adams argues the trial court erred in denying his motion to suppress because the drugs were obtained in violation of his Fourth Amendment rights.[4] Specifically, he maintains the Department's use of the tracking device constituted an unlawful search because the Department did not obtain a prior warrant.[5] We agree that the Department conducted an un-

---

4. Adams also argues the drugs should be suppressed because the Department failed to obtain a prior judicial order pursuant to section 17–30–140 in installing the tracking device and monitoring Adams's vehicle. In light of our finding that the Department failed to obtain a warrant necessitated by the Fourth Amendment, however, we do not address this argument. *See State v. Bostick*, 392 S.C. 134, 139 n. 4, 708 S.E.2d 774, 776 n. 4 (2011) (holding that if one issue is dispositive of another, the court need not address the other issue).

5. The State contends Adams does not raise a Fourth Amendment argument on appeal. However, a review of Adams's appellate materials makes clear that he does.

lawful search by installing the tracking device on Adams's vehicle and monitoring the vehicle's movements without obtaining a prior warrant. However, this unlawful search did not require suppression of the drugs.

## I. The Fourth Amendment and Tracking Device

"The Fourth Amendment provides in relevant part that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" *United States v. Jones,* —— U.S. ——, 132 S.Ct. 945, 949, 181 L.Ed.2d 911 (2012) (alteration in quotation). "[S]earches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson,* 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (internal quotation marks omitted).

In *United States v. Jones,* the United States Supreme Court held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'" 132 S.Ct. at 949. The Court characterized the government's conduct as the "physical[ ] occup[ation of] private property for the purpose of obtaining information." *Id.* The Court reasoned, "such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." *Id.*

 Here, the tracking device was installed while Adams's vehicle was parked in a public parking garage, and the device was used to monitor the vehicle's movements while it was on public streets and highways. Under *Jones,* the Department's installation of the device on Adams's vehicle and use of that device to monitor the vehicle's movements constituted a "search."[6] Therefore, the Department's failure to obtain a warrant made that search unreasonable and resulted

---

6. The device in this appeal operated identically to the device in *Jones.* *See Jones,* 132 S.Ct. at 948 (stating that its device was installed on the vehicle's undercarriage, used batteries, and transmitted information via satellite).

in a violation of Adams's constitutional rights.[7] Nevertheless, we must still determine whether that violation required suppression of the drugs seized from Adams's person. For the reasons below, we find it did not.

## II. The Exclusionary Rule and Adams's Traffic Violations

Although the installation of the tracking device on Adams's vehicle and monitoring of the vehicle's movements without a prior warrant constituted an unlawful search, the State argues as an additional sustaining ground that the exclusionary rule does not require suppression of the drugs found on Adams's person. The State maintains Adams's traffic violations were intervening criminal acts sufficient to cure the taint arising from unlawfully installing the device and monitoring the vehicle.[8] We agree.

The exclusionary rule prohibits the admission of evidence that is the fruit of an unlawful search. Specifically, it prohibits the admission of evidence (1) directly acquired during an unlawful search and (2) later discovered and derivative of the unlawful search.[9] *Murray v. United States*, 487 U.S. 533, 536–37, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988); *see also*

7. The State does not contend an exigency existed to foreclose the need to obtain a warrant while placing the device on the vehicle and monitoring the vehicle's movements.

8. As a second additional sustaining ground, the State claims suppression is not required because the Department used the tracking device in good-faith reliance upon *United States v. Knotts*, which the State contends *Jones* later overruled. *See Davis v. United States*, —— U.S. ——, 131 S.Ct. 2419, 2434, 180 L.Ed.2d 285 (2011) (providing that the exclusionary rule does not apply "when the police conduct a search in objectively reasonable reliance on binding appellate precedent" that was later overruled). We need not address this argument because we find the drugs were obtained after intervening illegal acts and during a lawful traffic stop and pat-down search. *See Bostick*, 392 S.C. at 139 n. 4, 708 S.E.2d at 776 n. 4 (holding that if one issue is dispositive of another, the court need not address the other issue).

9. Here, the movement of Adams's vehicle was the "direct evidence" obtained as a result of the unlawful search—the Department's installation of the device and monitoring of the vehicle. In contrast, the drugs subsequently seized from Adams's person constitute evidence derivative of the unlawful search.

*Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). However, under our case law the exclusionary rule does not apply to evidence obtained during a search or seizure conducted pursuant to an "intervening illegal act." *State v. Nelson,* 336 S.C. 186, 194, 519 S.E.2d 786, 790 (1999); *see also In re Jeremiah W.,* 361 S.C. 620, 624–25, 606 S.E.2d 766, 768 (2004).

In *State v. Nelson,* a police officer driving behind the defendant flashed his high beams to get the defendant's attention without intending to initiate a traffic stop. 336 S.C. at 189, 519 S.E.2d at 787. The defendant then ran a stop sign and sped through a neighborhood, and the officer initiated a traffic stop, with which the defendant complied. *Id.* When the officer approached the defendant's vehicle, he smelled alcohol and the defendant refused to participate in a field sobriety test. *Id.* The defendant was arrested for driving under the influence. *Id.* Our supreme court held that even if the officer acted unlawfully in initially attempting to get the defendant's attention, the evidence seized as a result of the subsequent traffic stop was admissible because the intervening traffic violations "constituted new and distinct crimes for which [the officer] had probable cause to stop [the d]efendant." *Id.* at 194–95, 519 S.E.2d at 790.

In this case, Sergeant Blair witnessed Adams commit two traffic violations before initiating the traffic stop. *See* S.C.Code Ann. § 56–5–2150(a)–(b) (2006) (providing that a driver must use his turn signal to indicate the lane change he intends to make); S.C.Code Ann. § 56–5–6190 (2006) ("It is a misdemeanor for any person to violate any of the provisions of this chapter unless such violation is by this chapter or other law of this State declared to be a felony."). Thus, the trail of taint arising from the Department's unlawful search was broken, and the intervening illegal act exception permitted admission of the drugs so long as they were lawfully obtained during the stop.

### III. The Resulting Search and Seizure

Adams contends the traffic stop and pat-down were unlawful because they were a mere pretext for a drug search. We disagree.

A traffic stop initiated pursuant to a traffic violation creating probable cause is not "rendered invalid by the fact that it was a mere pretext for a narcotics search." *State v. Corley*, 383 S.C. 232, 241, 679 S.E.2d 187, 191–92 (Ct.App. 2009) (internal quotation marks omitted), *affirmed as modified by* 392 S.C. 125, 708 S.E.2d 217 (2011); *see also Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). A police officer's "subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Corley*, 383 S.C. at 241, 679 S.E.2d at 192 (internal quotation marks omitted); *see also Whren*, 517 U.S. at 813, 116 S.Ct. 1769. Therefore, Sergeant Blair's and Officer Greenawalt's prior intentions and knowledge of Adams's involvement with drugs did not prevent the officers from conducting a lawful traffic stop and pat-down. A person stopped by the police in such a situation is protected from abuse of their rights by our Fourth Amendment framework.

a. *The Traffic Stop*

Evidence in the record supports the trial court's finding that the traffic stop was conducted consistently with Adams's Fourth Amendment rights.

"Temporary detention of individuals by the police during an automobile stop constitutes a 'seizure' of an individual within the meaning of the Fourth Amendment." *State v. Banda*, 371 S.C. 245, 252, 639 S.E.2d 36, 40 (2006). However, "[t]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.*

During a lawful traffic stop, an officer may "request a driver's license and vehicle registration, run a computer check, and issue a citation." *State v. Jones*, 364 S.C. 51, 57, 610 S.E.2d 846, 849 (Ct.App.2005) (internal quotation marks omitted). The officer may also order the driver to exit the vehicle. *Id.; State v. Williams*, 351 S.C. 591, 598, 571 S.E.2d 703, 707 (Ct.App.2002); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 110–11, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).

A lawful traffic stop can become unlawful if it exceeds the scope or duration necessary to complete its mission. *State v. Pichardo*, 367 S.C. 84, 98, 623 S.E.2d 840, 848

(Ct.App.2005); *see also Illinois v. Caballes,* 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). An extension is permitted only if (1) the encounter becomes consensual or (2) the officer has at least a reasonable, articulable suspicion of other illegal activity. *Pichardo,* 367 S.C. at 99, 623 S.E.2d at 848. If an officer uses a drug dog to sniff the exterior of a defendant's car during a lawful traffic stop, the sniff does not make the traffic stop unlawful, even without any evidence of drug activity, so long as the sniff does not extend the length of the stop beyond that time necessary to complete the stop's purpose. *Caballes,* 543 U.S. at 407–09, 125 S.Ct. 834.

 Here, Sergeant Blair had probable cause to stop Adams's vehicle because he witnessed Adams commit two traffic violations. The officers acted reasonably in instructing Adams to step out of the vehicle while they waited for a license and registration report. Sergeant Blair was also permitted to walk his drug dog around the vehicle while waiting for the completion of Adams's license and registration check. The first alert occurred a mere five to six minutes after the traffic stop began, and no evidence in the record indicates the drug sniff extended the duration of the stop.[10] Consequently, the officers' conduct up to that point was within constitutional bounds. Whether the drugs were admissible depends upon whether the resulting pat-down complied with Adams's Fourth Amendment rights.

b. *The Pat-down*

Evidence in the record supports the trial court's finding that the pat-down of Adams and retrieval of the drugs complied with his Fourth Amendment rights.

 An officer conducting a lawful traffic stop may conduct a pat-down search for weapons if the officer "has reason to believe the person is armed and dangerous." *State v. Smith,* 329 S.C. 550, 556, 495 S.E.2d 798, 801 (Ct.App.1998). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his

---

**10.** In fact, Adams does not contend the stop's duration was unlawfully extended.

safety or that of others was in danger." *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

"The purpose of [a pat-down] search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Dickerson,* 508 U.S. at 373, 113 S.Ct. 2130. Therefore, a *Terry* "protective search— permitted without a warrant and on the basis of reasonable suspicion less than probable cause—must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'" *Id.* (quoting *Terry,* 392 U.S. at 26, 88 S.Ct. 1868). "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Id.*

█ Under the plain feel doctrine, an officer may seize an item felt during a lawful pat-down search for weapons if the item's contour or mass makes its incriminating character immediately apparent. *Dickerson,* 508 U.S. at 375–77, 113 S.Ct. 2130; *State v. Abrams,* 322 S.C. 286, 288–89, 471 S.E.2d 716, 717–18 (Ct.App.1996). If that character is not immediately apparent, any manipulation of the item constitutes a further, unlawful search and the item will be suppressed. *Dickerson,* 508 U.S. at 375–77, 113 S.Ct. 2130.

In *Minnesota v. Dickerson,* the United States Supreme Court held that evidence obtained during a pat-down for weapons was inadmissible. During the pat-down, a police officer testified he "felt a lump, a small lump.... [He] examined it with [his] fingers and it slid and it felt to be a lump of crack cocaine in cellophane." 508 U.S. at 369, 113 S.Ct. 2130. The Supreme Court deferred to the state supreme court's interpretation of the record, which provided that the police's own testimony belied "any notion that [the police] immediately recognized the lump as crack cocaine. Rather, ... the officer determined that the lump was contraband only after squeezing, sliding and otherwise manipulating the contents of the defendant's pocket—a pocket which the officer already knew contained no weapon." *Id.* at 378, 113 S.Ct. 2130 (internal quotation marks omitted). The Supreme Court thus held that, although the police lawfully initiated the pat-down, "the officer's continued exploration of the [defendant's] pocket after

having concluded that it contained no weapon" was a further search, unsupported by the concern for weapons. *Id.*

In *State v. Abrams*, this court held evidence seized during a pat-down was inadmissible. 322 S.C. at 287–89, 471 S.E.2d at 717–18. The officer testified that he felt a "hard instrument" that was "tube like" and "about the size of a shotgun shell." *Id.* Moreover, the officer explained that he thought the object "could have been 'an instrument used to transport contraband' when he 'found out that there were no weapons on [the defendant's] person.'" *Id.* Thus, the court determined the evidence's incriminating character was not immediately apparent and "[a]ny further search was impermissible" because the officer did not believe the evidence was contraband until after he concluded the defendant was unarmed. *Id.*

In contrast, this court in *State v. Smith* held evidence obtained during a pat-down was admissible. 329 S.C. at 561, 495 S.E.2d at 804. Unlike in *Abrams*, the officer immediately determined the evidence was drugs during the initial pat-down search; even though he did squeeze the evidence further, the officer's "testimony indicate[d] he determined the object was contraband as soon as he felt it," and the "identification of the substance did not require additional squeezing or manipulation." *Id.* at 560–61, 495 S.E.2d at 803–04.

■ Here, evidence in the record supports the finding that Officer Greenawalt had reason to believe Adams was armed and dangerous to conduct a pat-down for weapons. Adams exhibited suspicious behavior, and the dog alerted for drugs before the pat-down began. *See State v. Banda*, 371 S.C. 245, 253, 639 S.E.2d 36, 40 (2006) ("This Court has recognized that because of the indisputable nexus between drugs and guns, where an officer has reasonable suspicion that drugs are present in a vehicle lawfully stopped, there is an appropriate level of suspicion of criminal activity and apprehension of danger to justify a frisk of both the driver and the passenger in the absence of other factors alleviating the officer's safety concerns." (internal quotation marks omitted)); *see also Terry*, 392 U.S. at 30, 88 S.Ct. 1868 (holding that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be

armed and presently dangerous," he may conduct a pat-down for weapons).

█ Evidence in the record also supports the finding that Officer Greenawalt immediately recognized the identity of the item. He felt a "jagged, round object" in Adams's groin area while conducting the pat-down search, and his training and experience led him to believe the object was drugs. The record does not indicate he determined the evidence's identity because of further manipulation of the object or that he determined Adams was unarmed before concluding the evidence was drugs. In light of our standard of review, therefore, the trial court properly denied the motion to suppress.

## CONCLUSION

For the aforementioned reasons, we affirm the trial court's denial of Adams's motion to suppress.

**AFFIRMED.**

WILLIAMS and LOCKEMY, JJ., concur.