# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cr. A. No. 1908008822 |
| | ) | |
| IVAN CORNELIUS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Date Submitted: June 16, 2021
Date Decided: July 8, 2021

*Upon Defendant Ivan Cornelius's Motion to Suppress*
**GRANTED.**

## <u>ORDER</u>

Anthony J. Hill, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware, Attorney for the State.

Sonia Augusthy, Esquire, Assistant Public Defender, Office of the Public Defender, Wilmington, Delaware, Attorney for Defendant Ivan Cornelius.

**SCOTT, J.**

## INTRODUCTION

Before the Court is Defendant Ivan Cornelius's ("Mr. Cornelius") Motion to Suppress (the "Motion"). After reviewing the Motion and the State's Response to Mr. Cornelius's Motion to Suppress (the "Response"), Mr. Cornelius's Motion is **GRANTED**.

## FINDINGS OF FACT

On August 14, 2019, Detective James Wiggins ("Detective Wiggins") and Probation Officer Phelps conducted a traffic stop for an alleged motor vehicle violation by Mr. Cornelius at roughly 9:35 pm.

Detective Wiggins is a law enforcement officer in the State of Delaware and has been employed by the Wilmington Police Department for over eight years. Initially, Detective Wiggins worked as a Patrol Officer within the Wilmington Police Department. At present, Detective Wiggins works within the Safe Streets Task Force ("Task Force") and has been assigned to it for the past four years.

The Task Force consists of a partnership between the Wilmington Police Department and the Probation and Parole Division for the State of Delaware. Police officers and probation officers work together for the purposes of crime reduction. In his current position, Detective Wiggins patrols the "violent areas of the city and

1

violent offenders and things of that nature" and monitors probationers.[1] Detective Wiggins stated that it is his job "to stop things from happening before they happen" and, accordingly, to proactively stop cars and ride around looking for suspicious activity.

Detective Wiggins drove an unmarked car while he was patrolling the city. He uses his own discretion, based on his experience and knowledge of where crimes occur, in choosing which areas of the city to patrol. The unmarked patrol car that Detective Wiggins used was not equipped with the same computers as standard patrol vehicles used by law enforcement to check for vehicle registration or any other related information. During his stop of Cornelius, he was unable to check that the car was registered. Additionally, his car was not equipped with any form of recording equipment nor was he required to wear body-worn cameras.

Notably, it is Detective Wiggins's understanding that he can search the entirety of a car as long as he smells marijuana. Detective Wiggins explained that, as a standard patrol officer, he would normally have to call in a traffic stop into WILCOM if he stopped a vehicle. However, as a Task Force officer, he does not need to report to WILCOM when he stops a vehicle for a traffic stop. As Detective Wiggins puts it, if he stops a car and smells marijuana, but does not issue a ticket,

---

[1] Tr. at p. 3, lns 17-19.

there would be no record of it. Moreover, Detective Wiggins estimated that he has made around a thousand traffic stops in the four years that he has been assigned to the Task Force and that he stopped around fifty vehicles the week prior.

Mr. Cornelius obtained a video from a nearby liquor store's surveillance system in anticipation of his suppression hearing. The video shows that his vehicle is stopped and parked in an on-street parking spot. Seconds later, Detective Wiggins turns on his unmarked vehicle's police lights and calls in for backup on an unrecorded channel used to call Task Force officers.

Detective Wiggins thereafter exits his vehicle and approaches Mr. Cornelius's vehicle on the driver side while Probation Officer Phelps approaches the passenger side. Right before Detective Wiggins and Probation Officer Phelps reach the doors of Mr. Cornelius's vehicle, a third police officer emerges from some unknown location. As Detective Wiggins begins speaking with Mr. Cornelius, the third police officer is searching with a flashlight into the backseat of the vehicle and Probation Officer Phelps is searching with a flashlight into the passenger side of the vehicle. At this point, roughly forty-five seconds have elapsed since Detective Wiggins turned on his vehicle's police lights.

At one minute and six seconds, the third officer aforementioned leaves as two more officers approach from the rear from an unknown location. Detective Wiggins remained at the driver side window and continued speaking with Mr. Cornelius

3

while the two other officers and Probation Officer Phillips continued their external investigation into the vehicle. At one minute and twenty-four seconds, another officer emerges from the rear from an unknown location and waits with the other officers at the rear of Mr. Cornelius's vehicle. At this juncture, there are a total of five officers on scene with only Detective Wiggins speaking with Mr. Cornelius.

While Detective Wiggins is at the driver side window, Detective Wiggins asks Mr. Cornelius for his license, registration, and proof of insurance. Detective Wiggins stated that Mr. Cornelius was only able to provide his driver's license but was unable to provide registration and proof of insurance. At the suppression hearing, Detective Wiggins first asserted that Mr. Cornelius did not give any explanation, but later changed his story and stated that he could not remember what the explanation was as to why Mr. Cornelius was unable to provide registration and proof of insurance.

While waiting for the requested documents, Detective Wiggins indicated that he smelled marijuana and noticed what appeared to be marijuana leaves in the door handle panel of the driver side door. Detective Wiggins claims that he also remembers seeing an air freshener,[2] but cannot recall whether it had been used.

Notably, during their discussions, Detective Wiggins did not pursue a line of questioning with Mr. Cornelius regarding his perceived smell of marijuana or

---

[2] Throughout the hearing, Detective Wiggins repeatedly and consistently referred to the air freshener as "blunt spray."

4

observations of the marijuana leaves on the door handle panel of the driver side door panel. However, since Detective Wiggins was allegedly unsure about whether Mr. Cornelius was smoking marijuana, possessed marijuana, or had been driving under the influence of marijuana, Detective Wiggins removed Mr. Cornelius from the vehicle to search the vehicle. He was not placed under arrest. Detective Wiggins also did not smell marijuana on Mr. Cornelius's clothing. At the hearing, Detective Wiggins stated that he conducted a search of the vehicle due to the following probable cause factors: "marijuana leaves found in the door," lack of registration and insurance, and the odor of marijuana.

At the time Mr. Cornelius steps out of his vehicle, there are a total of five officers on scene. Twenty seconds after Mr. Cornelius steps out of his vehicle, another two officers arrive for a total of seven officers on scene. While Detective Wiggins spoke with Mr. Cornelius, there are three officers, including Detective Wiggins, standing in front of Mr. Cornelius. There is one officer to Mr. Cornelius's rear and another three officers on the opposite side of the vehicle at the rear. Mr. Cornelius is then escorted to Detective Wiggins's vehicle while the other officers begin their search of Mr. Cornelius's vehicle.

Detective Wiggins claimed during direct examination that he found "a bunch of marijuana." When pressed for more information during cross-examination, Detective Wiggins clarified and stated he meant a "bunch of leaves." However, there

5

was not enough to send to the lab for testing. When asked how many leaves it would take to submit the marijuana to the state lab, Detective Wiggins replied that he does not know.

**STANDARD OF REVIEW**

In a suppression hearing, the Court sits as the finder of fact, assesses witness credibility, and weighs the evidence.[3] Since the motion challenges a warrantless search, the burden is on the State to establish that there was probable cause to justify a warrantless search of a vehicle.[4] Under the automobile exception to the warrant requirement, the police must have probable cause to believe that an automobile is carrying contraband or evidence of a crime before they may lawfully search the vehicle without a warrant.[5] Probable cause is subject to a totality of the circumstances analysis. To establish probable cause, the police are required to assess whether there are "facts which suggest, when *those facts* are viewed under the totality of the circumstances, that there is a fair probability that the defendant has committed a crime."[6]

---

[3] *State v. Dewitt*, 2017 WL 2209888, at *1 (Del. Super. May 18, 2017).
[4] *Hunter v. State*, 783 A.2d 558, 560 (Del. 2001) (emphasis omitted).
[5] *Tatman v. State*, 494 A.2d 1249, 1251 (Del. 1985).
[6] *Id.* (emphasis in original).

## DISCUSSION

Individuals are protected from unreasonable searches and seizures in Delaware by both the Fourth Amendment to the United States Constitution and Article I, § 6 of the Delaware Constitution. Under the Fourth Amendment and under Article I, § 6 of the Delaware Constitution, police may search a car without a warrant if they have probable cause to believe that the car contains contraband or evidence of criminal activity.[7] The legitimacy of motor vehicle stops is tied to the existence of a "reasonable suspicion that a legal violation has occurred."[8]

A "reasonable suspicion" exists when the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion."[9] The Delaware Supreme Court has recognized that "the quantum of evidence necessary for reasonable suspicion is less than that which is required for probable cause to arrest."[10]

However, even if the stop of the vehicle is lawful, the duration and execution of a traffic stop is limited by the initial purpose of the stop.[11] Any investigation of

---

[7] *Tann v. State*, 21 A.3d 23, 27 (Del. 2011); *State v. Prouse*, 382 A.2d 1359, 1363 (Del. 1978), *aff'd*, 440 U.S. 648 (1979).

[8] *State v. Prouse*, 382 A.2d 1359, 1361 (Del. 1978), *aff'd*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).

[9] *Juliano v. State*, 2020 6815414, at *14 (Del. Nov. 12, 2020).

[10] *Id.*

[11] *Caldwell v. State*, 780 A.2d 1037, 1047 (citing *Ferris v. State*, 355 Md. 356, 735 A.2d 491, 499 (1999)).

7

the vehicle or its occupants beyond that required to complete the purpose of the traffic stop constitutes a separate seizure that must be supported by independent facts sufficient to justify the additional intrusion.[12] This fact intensive inquiry ensures that the pursuit of the investigation unrelated to the traffic violation is not unreasonably attenuated from the initial purpose of the stop.[13]

According to the Delaware Supreme Court, this "standard respects the State's interest in investigating suspicious conduct during a valid traffic stop, while restricting police officers' authority to employ marginally applicable traffic laws as a device to circumvent constitutional search and seizure requirements."[14] This standard is intended to provide an appropriate measure of protection for motorists against arbitrary police conduct.[15]

Accordingly, the Court's analysis is twofold. First, the Court must determine whether there was probable cause for the traffic stop. If so, the Court then determines whether independent facts support a further seizure, or search, of the vehicle. To put it simply, any investigation of Mr. Cornelius's vehicle beyond what is required to complete the purpose of his traffic stop constitutes a separate seizure that must be supported by independent facts sufficient to justify the additional intrusion.

---

[12] *Id.*
[13] *Juliano,* at *15.
[14] *Caldwell*, at p. 1048.
[15] *Juliano*, at *15.

There was not enough information provided by the State such as when the officers first started following Mr. Cornelius's car, how far they followed him and what they observed to determine whether he violated 21 Del. C. § 4155(b). The statue states that a "signal of intention to turn or move right or left when required shall be given continuously during not less than the last 300 feet or more than ½ mile traveled by the vehicle before turning.[16]

Although the State failed to meet its burden of proving a valid traffic stop, the Court will go on to determine whether there was probable cause to search.

The State's evidence on numerous occasions during the hearing, was contradicted. Important information was lacking because details were not provided.

The Detective claimed he saw a "bunch of marijuana," but then later claimed that it was an insufficient amount to send to the State lab for testing. When asked about such statements during cross examination, the Detective stated he meant "a bunch of leaves." After being unable to state how many leaves are needed to send for testing, the Detective concedes that the lab is able to test even small, personal amounts of marijuana. The Detective further conceded that the amount he allegedly observed was probably either less than personal use or just personal use.

---

[16] 21 *Del. C*. § 4155(b).

When describing his finding of an air freshener at the hearing, Detective Wiggins repeatedly referred to such air freshener as "blunt spray."

Last, Detective Wiggins's initial testimony concerning his observation of the marijuana leaves and air freshener is contradicted by his later testimony. First, in response to what Detective Wiggins noticed about the car while engaging with Mr. Cornelius in the vehicle, Detective Wiggins claimed he smelled marijuana, observed marijuana leaves, and air freshener. Later, in response to Mr. Cornelius's counsel's statement concerning whether Detective Wiggins observed marijuana leaves before the two minutes and twenty second mark in the video, Detective Wiggins responded "I'm not sure if I've seen it yet or not."[17]

The State argues that the smell of marijuana alone is sufficient to establish probable cause. Marijuana odors, while relevant to probable-cause determinations, does not require this Court to find that probable cause exists in every circumstance on sole basis of the odor. Probable cause determinations are made by evaluating the totality of the circumstances.

For instance, in *Law v. State*,[18] the vehicle's speed, the occupant's extreme nervousness, *and* the odor of marijuana contributed to the Court's determination that

---

[17] Tr. at p. 65, lns 14-15.
[18] *Law v. State*, 185 A.3d 692, 2018 WL 2024868, at *1 (Del. May 17, 2018)

probable cause existed for the search of the car. Likewise, in *Valentine v. State*,[19] the occupant's excessive speed, the time of day, *and* the odor of marijuana contributed to the Court's determination that probable cause existed.[20] As the Supreme Court stated in *Caldwell*, it requires a fact-intensive inquiry to ensure that the pursuit of the investigation unrelated to the traffic stop is not unreasonably attenuated from the initial purpose of the stop.

Weighing against a finding of probable cause is that (1) an odor or presence of marijuana is misstated, in that it didn't exist; (2) the arrival of five additional police officers who positioned themselves in a manner consistent with preparing for a search, despite any evidence that a search was likely necessary; (3) the overstated the prevalence of "blunt spray;" and (4) failure to use normal police procedure and recordkeeping.

Based on a totality of circumstances, the Motion to Suppress is GRANTED.


**IT IS SO ORDERED.**


_____/s/ Calvin L. Scott_____
**The Honorable Calvin L. Scott, Jr.**

---

[19] 207 A.3d 166 (Del. 2019)
[20] *Valentine v. State*, 2019 WL 1178765, at *3 (Del. 2019).